## UNITED STATES v. KATZ DRUG CO. et al.

## KATZ DRUG CO. v. UNITED STATES et al.

### Nos. 12681, 12690.

Circuit Court of Appeals, Eighth Circuit.

July 31, 1945.

Paul R. Stinson, of Kansas City, Mo. (Arthur Mag and Stinson, Mag, Thomson, McEvers & Fizzell, all of Kansas City, Mo., on the brief), for Katz Drug Company.

Wilma C. Martin, Atty., Department of Justice, of Washington, D. C. (Norman M. Littell, Asst. Atty. Gen., Vernon L. Wilkinson, Atty., Department of Justice, and J. Edward Williams, Acting Head, Lands Division, both of Washington, D. C., and Maurice M. Milligan, U. S. Atty., of Kansas City, Mo., on the brief), for the United States of America.

Before GARDNER, THOMAS, and JOHNSEN, Circuit Judges.

JOHNSEN, Circuit Judge.

The United States and Katz Drug Co. have both appealed from a condemnation award of $4,353.50 in favor of Katz and against the United States. The parties had waived appointment of commissioners under the Missouri statutes and also a jury trial, and the compensation was fixed by the court.

The United States, at the request of the Secretary of War, had instituted condemnation on July 11, 1942, under section 201, Title II, of the Second War Powers Act of 1942, 56 Stat. 177, 50 U.S.C.A.Appendix, § 632, to acquire for military purposes the

immediate possession of a four-story warehouse building located in Kansas City, Missouri, and its temporary use to June 30, 1943. Katz had a lease on the second and third floors of the building,[1] which ran to September 30, 1944. Upon the filing of the condemnation petition, the court entered an order authorizing the United States to take *immediate possession of the building*, except that Katz was given until August 11, 1942, to deliver possession of its space. An application by Katz for additional time to move out was denied.

Katz's space was used as a warehouse for the chain of retail drug stores which it was operating in Missouri, Iowa, Kansas and Oklahoma. It regularly carried in the warehouse and had on hand at the time over $1,000,000 worth of merchandise. The war and its stimulation of activities had created a scarcity of warehouse space in the Kansas City area. The only other warehouse that Katz could find which was suitable and probably available was a building in North Kansas City, which was then occupied by U. S. Gypsum Co. under a lease running to December 31, 1942. Gypsum refused to give up the building, but Katz sent a representative to negotiate with the owner in Ohio and succeeded in obtaining a lease (which the owner required to be made for a period of 15 years) to commence on the expiration of Gypsum's term. When Gypsum was informed that Katz had obtained this lease, it consented to sublease the building to Katz for the balance of its term and to give immediate possession, but only upon payment of a bonus to it of $12,000. The amount of the rent payable for the balance of Gypsum's term was somewhat less than that which Katz would have had to pay on the condemned space during the same period, so that its net loss from having to pay the bonus was $10,053.94.

█ Katz sought to have this loss taken into account in the determination of just compensation. What it really argued was— the case having been tried before the decision of the Supreme Court in United States v. General Motors Corporation, 323 U.S. 373, 65 S.Ct. 357,—that it was entitled to reimbursement for the bonus loss as a damage sustained in attempting to comply with the court's order for summary possession. In the trial court's memorandum opinion, findings and conclusions, the court declared that the building occupied by Gypsum was the only warehouse that was available to Katz in the Kansas City area; that Katz was compelled to pay the $12,000 bonus to Gypsum in order to obtain immediate possession and to put itself in position to accomplish a removal of its merchandise from the condemned space within the time fixed by the court's order; that the payment of the $12,000, "less the rent saving between August 11 and December 31, resulted in a net loss to Katz Drug Company of $10,053.94"; but that Katz was not entitled to "receive" the amount of this loss and had no "remedy" for it, because it represented "consequential damages for which compensation is not recoverable in a proceeding like this." Whether this item properly was entitled to consideration in the allowance of compensation, and, if so, in what manner, is one of the questions presented by Katz's appeal.

Katz sought also to have taken into account in the determination of just compensation the extra cost of $15,409.61, to which it was put in moving and getting its goods located in the new building within the limited period allowed by the court's order, over what its expenses would have been for these operations if it had been able to carry them on in the normal time and manner. The amount of its total expenses in transferring, safeguarding and placing the goods, and in dismantling and reinstalling shelving and other equipment, and in getting the new space into suitable condition generally, was $48,144.58. It did not ask to have this general figure considered, but only the $15,409.61 part of it which represented "above-normal moving cost" from overtime pay, special labor, etc., that was necessary to get the task completed by August 11th but that would have been avoided if the moving could have been done in the regular way and time for a job of that size and character. The trial court declared in its memorandum opinion, findings and conclusions that Katz had been compelled, in order to comply with the court's possession-order, "to remove its merchandise from the condemned warehouse to its new warehouse * * * at a necessary cost, in excess of what would have been a normal cost, of $15,409.61,"

---

[1] All the other parties having interests in the building have accepted the amounts which the court fixed and allowed them, so that only the question of the compensation or damages due Katz is here involved.

but that this extra moving expense, like the bonus necessary to be paid to Gypsum to obtain immediate possession of the new warehouse, represented consequential damages from the condemnation for which there was no recovery right against the United States. As with the bonus payment which it had to make to Gypsum, Katz's appeal raises the question of its right also to have had this "above-normal moving cost" of $15,409.61 considered in the determination of just compensation.

Under the rule laid down in United States v. General Motors Corporation, 323 U.S. 373, 65 S.Ct. 357,[2] decided after the trial of this case, the amount of the bonus which Katz reasonably was obliged to pay to obtain warehouse space in the conditions of the Kansas City market and the "above-normal moving cost" which was necessitated by the court's summary possession-order clearly were entitled to be proved and to receive consideration on the question of just compensation, "not as independent items but as elements to be considered in arriving at the sum which would be just compensation for the interest which the Government condemned," or "to aid in the determination of what would be the usual—the market—price which would be asked and paid," in the conditions of the community market, for such a temporary use, as the United States was appropriating, of space currently in the hands of a tenant for a definite term and being used for an established business purpose, and of which possession would have to be summarily delivered.

While the trial court was correct, of course, in regarding these items as not being directly allowable or recoverable as damages, it is apparent from its memorandum opinion, findings and conclusions that it further treated them as being entitled to no consideration whatsoever in a determination of the value of the use of the warehouse space taken from Katz and the delivery of summary possession thereof, and that it undertook to fix the market value of the space—in the language of the General Motors Corporation case—"as if that space were bare and in the market for rent." Katz is entitled to a reversal and a new trial on this ground, under the

General Motors Corporation case. The observation might also be made that any premium or bonus which the market was commanding for immediate possession of other comparable warehouse space and any special or out-of-the-ordinary expense or loss to which the seller of particular space necessarily would be put in order to be able to deliver it in that manner would far more likely and directly enter into the value or price that a seller would reasonably ask and that a buyer would reasonably pay for a temporary use of such space accompanied with immediate possession than would some of the more remote and general elements of which the General Motors Corporation case purports also to sanction consideration. Beyond this, there is no call for us to make expression in relation to Katz's appeal.

■ The United States in its appeal assails the trial court's finding that, while the condemnation sought only to acquire the use of Katz's space to June 30, 1943, the practical effect of the taking was to destroy the value of Katz's entire term, running to September 30, 1944, and that Katz was entitled to a compensation allowance of $4,353.50 on that basis. The court declared that the use of the space from June 30, 1943, to September 30, 1944, "although technically not taken, in effect was taken"; that "the cost of moving in and moving out again, for a period of fifteen months only, would destroy any value"; that "obviously it was worth nothing to Katz Company"; and that "almost equally obviously it was worth nothing to any other and so had no market value."

We think the contention of the United States must be sustained that the evidence in the record did not warrant a finding that the value of the fifteen-months term remaining beyond the condemned-use period had been destroyed. Katz naturally did not want to re-occupy the space because of the moving expense involved to it and because of its new warehouse lease, but these facts would not be sufficient to justify a finding that the space had no market value in the community for its fifteen-months remaining term. The evidence shows, as has been previously indicated, that there was a shortage of warehouse

[2] It should be noted that the Supreme Court has since granted certiorari in United States v. Petty Motor Co., 10 Cir., 147 F.2d 912, certiorari granted 323 U.S. —, 65 S.Ct. 1571, and that the case is now pending in the Supreme Court, but whether this portends any modification, limitation or clarification of the rule in the General Motors Corporation case is, of course, conjectural.

space in Kansas City as a result of the war and its stimulation of activities. There was nothing to suggest that this demand would probably have ceased or subsided by June 30, 1943, or before September 30, 1944, or that it had in any way done so up to the time of the trial.[3] Katz's lease on the condemned space gave it the right to sublet. The record contains evidence as to the rental value of such warehouse space, on an empty basis, for short periods of current use such as eleven to fourteen months. It appears also that Gypsum had occupied the building, on which it gave Katz a five-months sublease and the right of immediate possession for a $12,000 bonus, under a year-to-year lease terminable at the end of the first year or of any year thereafter on three months notice by either party.

█ It is further contended, however, by the United States that Katz was not even entitled to have the value of its leasehold rights determined to June 30, 1943, but only to January 22, 1943, because the lease had become extinguished on the latter date, through the foreclosure of a pre-existing mortgage on the property. The trial court found, however, that, "while the Katz Drug Company lease * * * was subject to the mortgage * * * Katz Drug Company on July 11, 1942, was able and willing to protect its lease and had taken such steps before July ·11, 1942, as would have prevented a foreclosure and have insured the continued occupancy of the premises by Katz Drug Company." The undisputed evidence shows that prior to the condemnation Katz had agreed with the owner of the property to take a new ten-year lease, which had been fully negotiated and was ready for execution, and that on the strength of this further Katz occupancy the owner had been able to make arrangements for a refinancing of the defaulted mortgage. It shows also that, if for any reason a foreclosure had been instituted, Katz was financially able to and would, in order to protect its occupancy, have bid in the property for the amount of the mortgage debt. The foreclosure appears to have been precipitated by the condemnation and the resulting removal of Katz from the building in obedience to the court's possession-order. The foreclosure culminated in a sale of the property and the vesting of title in a purchaser on January 22, 1943.

The foreclosure purchaser thereafter was made a party to the condemnation proceeding, and the court determined the compensation rights of all the parties having interests in the property on a single hearing, in which they, and of course the United States, all participated and became adversaries of each other. The court fixed the compensation to which the former owner and the foreclosure purchaser aggregately were entitled for the condemned use as a separate amount from that to which Katz was entitled for the appropriation of its leasehold rights. The owners of the property contended on the hearing, as the United States attempts to do here, that Katz's rights should be held to have been extinguished on January 22, 1943, and that they, and not Katz, were therefore entitled to the benefit after that date of the difference between the market value of the Katz space and the rental under its lease. The court, in its findings and judgment, refused to take this view and held that the situation should be regarded realistically and practically and that Katz's rights for purposes of compensation should be treated as having continued through the condemned occupancy, notwithstanding the foreclosure.

After the entry of judgment predicated on this ruling, the former owner filed a motion to modify the findings and judgment, in another attempt to limit Katz's compensation rights to January 22, 1943. One of the purposes in filing the motion apparently was, as indicated in the argument and submission of it to the court, to have it made absolutely clear in the record—whatever might be the ruling on the merits of the motion—that the compensation allowed the former owner and the foreclosure purchaser was in no way a duplication of that allowed Katz. The recitation in the order overruling the motion leaves no room for any contention that there has been the slightest duplication of compensation, nor has the United States presumed so to contend.

The naked effect of what the United States argues here is that—even though it has not been required to pay compensation to the owners of the property for the difference between the market value

---

[3] The trial was held during the latter part of March, 1943. Submission of the cause on appeal was allowed to await the disposition of the General Motors Corporation case in the Supreme Court.

of the Katz space and the rental value under the Katz lease from January 22, 1943, to June 30, 1943; and even though the court has held that, as between the owners of the property and Katz, Katz's rights for compensation · purposes were legally entitled to be regarded as having continued through the condemned occupancy; and even though the property owners have allowed their compensation judgment and the court's ruling as to Katz's rights to become final and a matter of res judicata against them; and even though the United States has similarly chosen to recognize the judgment awarded the property owners as correct and in making payment of compensation to them has accepted the benefit of the court's adjudication as to the scope of Katz's rights against the owners—it should still have the right to contend, on this appeal against Katz,. that Katz's rights were extinguished on January 22, 1943, and that all compensation rights for the disputed period therefore belonged to the property owners, despite the court's adjudication and its own acceptance of the ruling in making payment of compensation to them, and that it should accordingly be permitted to escape payment of any compensation whatever for the difference between the market value of the Katz space and the rental under the Katz lease from January 22, 1943, to the expiration of the condemned occupancy on June 30, 1943.

On all the circumstances, including the manner in which the compensation rights of the parties were tried and fixed, the court's ruling as to the relationship of Katz's rights to those of the property owners for the period in question permeated the entire compensation situation, and the United States will therefore not be permitted to accept the benefit of that ruling for the purpose of making payment of compensation to the property owners, and at the same time deny its validity for the counter-purpose of escaping payment of complementary compensation to Katz. It might perhaps even be doubted whether the question of the rights of the property owners and Katz in the compensation payable for the use of the property from January 22, 1943, to June 30, 1943, arising out of some change in the legal status or relationship between them after the institution of condemnation, was in the situation anything at all more than an adjudicatory matter between them, which, when they allowed the court's ruling and judgment on it to become final, was also binding upon the United States, because it did not affect the amount of total compensation payable for the condemnation.

■ As to Katz's contention, previously referred to, that its lease rights from June 30, 1943, to September 30, 1944, after the expiration of the condemned occupancy, had been destroyed by the condemnation and should also be taken into account in the determination of just compensation, we have declared above that, without regard to any other question in relation to such rights, Katz's evidence failed to show that the condemnation had destroyed the market value of the occupancy right for that period. If Katz on a new trial should reassert a claim to compensation for destruction of the value of the right of occupancy for that period, it will have to assume the burden, in addition to proving that such a right of occupancy would have no market value, of establishing that its status and relationship to the property, under all the circumstances of the situation, entitle it to make such a claim. The question is broader than that inhering in the court's adjudication that, for the purpose of fixing or adjusting compensation for the partial period of condemned use from January 22, 1943, to June 30, 1943, as between Katz and the foreclosure purchaser, Katz's rights were entitled to be regarded as having continued in effect during that time, notwithstanding the foreclosure.

■ Katz, with commendable desire to make its warehouse troubles a closed incident, has offered to accept a judgment for $29,817.05 and interest, if we are willing to enter it or to direct the trial court to do so. This sum has been arrived at by adding the excess of the market value of the bare space over the rent of the lease for the entire remaining term of the lease, as fixed by the trial court in the sum of $4,353.50, and the $10,053.94 net bonus cost for getting possession of the new warehouse, and the $15,409.61 above-normal moving costs occasioned by the haste of delivering possession. The offer has, of course, been made without prejudice to any of Katz's rights, if a new trial is required. We do not feel, however, that the situation is one where we can with propriety enter such a judgment or direct the trial court to do so. We cannot say, under the theory on which the case was tried, that Katz is entitled to recover at least

that sum, particularly in view of the fact that, on the evidence in the record, the trial court erred in including the loss of bare-space value from June 30, 1943, to September 30, 1944, in the $4,353.50 figure which it fixed and which Katz has adopted as part of its judgment proposal. Again, as we have heretofore indicated, the amount of the net bonus cost and of above-normal moving cost are, of course, not properly allowable as independent items but are merely factors for consideration in arriving at the market value of the space under all the conditions and circumstances of the taking. The matter seems to us so essentially to be for the proper evaluation and sound judgment of the trial court that the case ought to be relegated to it for that purpose. If the parties mutually wish to avoid the burden and expense of a re-trial, they are of course at liberty to make such stipulation for its submission and determination by the trial court as they desire.

The judgment is reversed and the cause is remanded for further proceedings.