**UNITED STATES v. AMERICAN PRE-CISION PRODUCTS CORP. et al.**

Civ. A. No. 422–51.

United States District Court
D. New Jersey.

July 17, 1953.

**824**

Grover C. Richman, Jr., U. S. Atty., by Frederic C. Ritger, Jr., Asst. U. S. Atty., Newark, N. J., William B. Becker,

C. W. Tayler, Washington, D. C., for plaintiff.

McGlynn, Weintraub & Stein, by Edward R. McGlynn, Newark, N. J., for defendants Nathaniel Elin, Charles Elin and Louis Ross.

HARTSHORNE, District Judge.

This is a civil action brought by the United States of America as plaintiff, by virtue of the provisions of Revised Statutes, Sections 3490 and 5438, now 31 U.S.C.A. § 231, commonly known as the False Claims Act, of which this Court has jurisdiction under Ibid. Sec. 232. So far as pertinent, the False Claims Act provides:

"Any person * * * who shall make or cause to be made, or present or cause to be presented, for payment or approval, * * * any claim upon or against the Government of the United States, or any department or officer thereof, knowing such claim to be false, fictitious, or fraudulent, or who, for the purpose of obtaining or aiding to obtain the payment or approval of such claim, makes, uses, or causes to be made or used, any false bill, receipt, voucher, roll, account, claim, certificate, affidavit, or deposition, knowing the same to contain any fraudulent or fictitious statement or entry, or who enters into any agreement, combination, or conspiracy to defraud the Government of the United States, or any department or officer thereof, by obtaining or aiding to obtain the payment or allowance of any false or fraudulent claim * * * shall forfeit and pay to the United States the sum of $2,000, and, in addition, double the amount of damages which the United States may have sustained by reason of the doing or committing such act, together with the costs of suit; * * *."

Defendant Nathaniel Elin was the President and guiding spirit of defendant American Precision Products Corporation ("Precision"), and controlled

the American Foundry & Castings Company, Inc. ("Foundry"), the stock of such corporations being owned by himself, his wife, defendant Sadye Elin, and his son, defendant Charles Elin. Nathaniel Elin had made his son Charles, while in the service in World War II, a gift of stock in "Precision" and had made him Vice President. All the other individual defendants were officers or leading employees of "Precision". December 27, 1946 "Precision" entered into a contract with the United States Treasury Department Procurement Division to manufacture and deliver 1,010 diesel engines and parts, at a total price of upwards of $644,000 and on January 4, 1947 "Precision" entered into a second contract with the same Government entity, to manufacture and deliver a quantity of pumps and engines at a contract price in excess of $210,000.

Since early deliveries were called for, and both corporations were short of funds, the contracts had incorporated in them the standard progress payment clause providing for periodic partial payments to be made by the U. S. Treasury Department to the contractor during performance in an amount equalling 80% of the value of inventory then on hand, plus 80% of the estimated value of work and supplies in their then state of completion, as certified by a progress payment invoice to be submitted by the contractor to the Treasury. Under this clause "Precision", January 31, 1947, submitted its progress payment invoice, signed and sworn to by Nathaniel Elin, to the U. S. Treasury Department, calling for an 80% payment, in the amount of $85,627.23, on the first of the above two contracts. On the second of such contracts, and on the same date, it submitted its similarly executed progress payment invoice, calling for 80% payment, in the amount of $21,333.93. Both these invoices were duly paid by plaintiff.

April 10, 1947 similar progress payment invoices were submitted by "Precision" to the Treasury Department on the above contracts, calling for payment in the respective amounts of $89,278.61 and $39,227.25. Both these invoices were duly paid to "Precision" by plaintiff.

May 8, 1947, similarly executed progress payment invoices were submitted by "Precision" to the Treasury Department calling for payment in the respective amounts of $74,255.67 and $17,644.91. However, an inspection of "Precision's" plant and work raised a question in the minds of the Government as to the correctness of these last invoices, so same were not paid, and shortly thereafter, indeed after the expiring of the delivery dates under the contract, and without delivery, the above companies were subjected to reorganization proceedings under Chapter X of the Bankruptcy Act, 11 U.S.C.A. § 501 et seq. Deliveries under the contracts accordingly were never made, plaintiff having filed its claim as a creditor in such proceedings for the amount of its above payments, and having received its dividend thereon as a priority creditor under the statute. 31 U.S.C.A. § 191.

Under such facts the issue is as to the liability under the above False Claims Statute of both "Precision" and "Foundry", now out of business, and of the individual defendants, officers and stockholders of both companies. Such individual defendants moved for dismissal, and in the absence of objection by the Government thereto, the complaint was dismissed as to Sadye Elin, Francis X. Connors, Helma Kennedy, Harvey Gross, Nicholas Biase, Louis Ross, and Jacob C. Abramson. There thus remained at the termination of the trial, as defendants, the two corporations, "Precision" and "Foundry" and the two individual defendants, Nathaniel Elin and his son, Charles Elin. It should be added that previously defendant Nathaniel Elin had pleaded guilty, and been sentenced, on an indictment charging him with the very conspiracy with which he is charged in the complaint herein, paragraph XVIII, such complaint also charging the substantive offenses recited in the False Claims Act.

826

■ It is proven beyond a doubt that the six above progress payment invoices signed and sworn to by defendant Nathaniel Elin for "Precision", showing "Foundry" as being owned and operated by "Precision", were, in fact, false, to Nathaniel Elin's personal knowledge. It is thus clear that he is personally responsible for a violation of the substantive offenses of the False Claims Act. Indeed, save possibly for technical reasons, he would also seem clearly guilty of having been a party in violation of such act to a "conspiracy to defraud the Government of the United States * * by obtaining or aiding to obtain the payment or allowance of any false or fraudulent claim". Since this conspiracy is in substance the same as that to which he pleaded guilty on the above indictment, and the parties in this civil suit are the same as in those criminal proceedings, he is estopped by the record to deny civil liability as such conspirator here. Local 167 of International Brotherhood of Teamsters, Chauffeurs, Stablemen & Helpers of America v. U. S., 1934, 291 U.S. 293, 54 S.Ct. 396, 78 L.Ed. 804; Emich Motors Corp. v. General Motors, 1950, 340 U.S. 558, 568, 71 S.Ct. 408, 95 L.Ed. 534; U. S. v. Bower, D.C.E.D. Tenn.1951, 95 F.Supp. 19; U. S. v. American Packing & Provision Corp., D.C.N.J.1953, 113 F.Supp. 223; U. S. v. Accardo, D.C.N.J.1953, 113 F.Supp. 783.

The remaining questions are as to (1) the responsibility of Nathaniel Elin's son, Charles Elin, and as to (2) the measure of damages, under this installment payment contract.

### Charles Elin

■ There is no proof that Charles Elin either made or caused to be made, or presented or caused to be presented, the invoices in question. While he was a nominal officer of "Precision", this position was purely nominal, a gift with stock, from his father, Nathaniel, while he, a young man, was in service in World War II. Even after his return he was merely "carrying out orders" as a sales employee, primarily of "Foundry", in connection with its work for third parties, not the United States Government, and with no authority over "Precision's" financial transactions whatever. Thus he cannot be found to have participated in the substantive offenses set forth in the False Claims Act. He can only be held liable if he shall have been party to a "conspiracy to defraud the Government of the United States * * * by obtaining or aiding to obtain the payment or allowance of any false or fraudulent claim".

■■ It is settled law that to be a party to a conspiracy, whether criminal or civil, one must actually participate therein by aiding or abetting it in some way. Mere acquiescence or standing by and watching others conspire does not suffice to impose either criminal or civil conspiratorial responsibility. "The essential elements whether of a criminal or 'civil' conspiracy are the same * *." 11 A.J., Conspiracy, Sec. 45. "Mere passive cognizance of the crime or unlawful act to be committed or mere negative acquiescence is not sufficient" to impose responsibility. Id. Sec. 4; Young v. U. S., 5 Cir., 1931, 48 F.2d 26; Patterson v. U. S., 6 Cir., 1915, 222 F. 599, certiorari denied 238 U.S. 635, 35 S. Ct. 939, 59 L.Ed. 1499; U. S. v. Lancaster, C.C., Georgia 1891, 44 F. 896, 10 L.R.A. 333.

This being the clear principle applicable to the particular tort of conspiracy here in question, we are not left to rely solely on the rule of responsibility of corporate officers for torts generally. This is sometimes laid down as requiring participation, sometimes as acquiescence with knowledge, when the officer "should have objected and taken steps to prevent it." 14–A C.J. 175; 3 Fletcher, Cyclopedia Corporations, Sec. 1135 (1947 Revision); 19 C.J.S., Corporations, § 845. But cf. 19 C.J.S., Corporations, § 846, calling for "active participancy" as a basis for liability, and 3 Fletcher, supra, Sec. 1137. Indeed, the cases which pass on the question, and find responsibility, are generally those which find that the officer liable did

actively participate in the tort. U. S. ex rel. Marcus v. Hess, D.C.W.D.Pa.1941, 41 F.Supp. 197, 212, affirmed 1943, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443.

In any event, the present question being one as to responsibility for a statutory conspiracy, conjoined with other affirmative acts, it is clear that, to be liable, defendant Charles Elin must be found to have participated affirmatively in a conspiracy to defraud the United States, by obtaining or aiding to obtain the payment or allowance of a false claim. We search the record in vain for any such participation by Charles Elin in any such conspiracy, save that of introducing the production manager of "Precision", one Ross, to whose dismissal as a defendant plaintiff has not objected, to an acquaintance of Elin, where some pistons could be purchased. Those pistons were later shown, by others than Charles Elin or Ross, to the Government inspectors, as being "Precision's" property, as a basis for one of its false claims.

■ It is no doubt true that Charles Elin, with all the other employees, knew that "Precision" was trying to get the Government to advance more moneys to it than it was entitled to under the above 80% progress payment clause. The testimony of defendant Louis Ross, the production manager, who this Court feels was doing his best to tell the truth, whether it helped plaintiff as it did, in certain instances, or not, is clearly to this effect. Ross says he well recalls Nathaniel Elin coming into the shop and waving the progress payment papers at the men there, telling them that he would be in a jam unless they speedily produced, as they promised, the items incorporated in the invoice. Undoubtedly, all attached to the two corporations knew of this situation, a then fraud to be sure, but calling on all concerned for redoubled efforts to make good ultimately these representations to the Government. However, the only man who actually participated with Charles Elin in getting these pistons was this same Louis Ross, the production manager.

He is definite, clear and circumstantial, his words carrying the ring of truth to this Court, that his, Ross', purpose in getting the pistons was actually to use these pistons in "Precision's" production, and that he had no idea that later they would be shown by others to the Government inspectors as property of "Precision", and only after the engineers had decided to overrule Ross in his intent to use them. Ross, as well as Charles Elin, is clear that Elin, then working for "Foundry", not "Precision", casually dropped in to the "Precision" offices at the very time that Ross wanted to get these pistons for that purpose, that Elin accordingly telephoned a friend of his and arranged so that they could be obtained. But that at that time neither he, Ross, nor Elin, had any idea of fooling the Government inspectors, that all occurring a few days later, after Elin had departed on his own work. Of course, Elin's written statement to the F.B.I. is to the contrary of this and of Elin's testimony, and so are some words from Connors and Biase. But Connors is a clearly biased witness, whose words are hesitant at that, and Biase goes into no detail. As for Elin's statement, while it is detailed, much of it clearly states the facts, not as Charles Elin knew them at the time they occurred, but as he found them out much later, before his statement was taken. This may well apply to that portion of his statement referring to the piston incident. In any event, this sole, extremely limited, charge of participation by Charles Elin, is not sufficiently established to make this Court believe that this young, inexperienced, purely nominal, officer, engaged in another line of work, was an active participant in a conspiracy to defraud the United States.

### Measure of Damages

■ (1) Forfeitures. On each of the two contracts there were three sets of false claims made, two in January, two in April, two in May. On those in January and in April payments were made, but no payments were made on the two in May. Nevertheless, since

they were false, forfeitures go regardless of damages. U. S. ex rel. Marcus v. Hess, D.C.W.D.Pa.1941, 41 F.Supp. 197, affirmed, 1943, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 44; U. S. v. Rohleder, 3 Cir., 1946, 157 F.2d 126.

As to the number of forfeitures, the statute imposes same for the presentation of knowingly false "claims". These claims are referred to in all the categories of facts for which forfeitures are imposed in the statute in question, though in certain instances other false papers in support of same are alluded to. To each of the above six progress payment invoices in this case, there were added schedules setting forth a large number of items upon which such invoice was based. However, the payment by the Government, which it now claims to have lost, was in the exact amount of this total progress payment invoice, and was obviously thus based directly thereon. Each of such invoices would thus seem to be the statutory "false claim", for the presentation of which the $2,000 forfeiture is imposed, and not each of the large number of false items in the schedules attached to the invoices which, lumped together, support the invoice. Thus the forfeitures are six, totalling $12,000.

■ (2) Actual Damages. The damages suffered by plaintiff from the falsity or fraud of defendants are, irrespective of mitigation, the difference between what plaintiff advanced in reliance on such false claims, and what plaintiff would have advanced if the false items had not been included in the claims. Plaintiff has proven a series of falsities in the January invoices. He has also proven a series of falsities in the April invoices, and again, to a more limited extent, in those of May. Since, in both January and April, plaintiff paid money on a knowingly false claim, each of these form a basis for a cause of action. Hence the forfeitures above. But we now are considering, not the existence of a technical cause of action, but of the damages which flowed therefrom. As to this defendant claims, and plaintiff's own witnesses have proved, that certain of the items which were falsely claimed in January were, in fact, manufactured by defendant, and were the basis of a proper, not false, claim, in April. Moreover, the April progress payment invoice, with its schedules attached, was cumulative, and included all the items set forth in the preceding January invoices.

Obviously, then, as to an item for which plaintiff wrongfully paid in January, but for which it should rightfully have paid in April, had not the payment been made in January, plaintiff was not actually damaged, though defendant did incur the technical forfeiture in that regard. Thus to find the amount plaintiff paid out falsely, we should take the difference in April between the goods in defendant's hands awaiting delivery to plaintiff, plus the labor expended thereon, and the amount set forth in defendant's April invoice of those items, and take 80% of that difference. If we had such a definite inventory of the goods on hand and labor expended thereon in April, simple subtraction would measure the damages.

Unfortunately, however, no such inventory exists. For, after the reorganization proceedings under Chapter X of the Bankruptcy Act, through no fault of either party, but by order of the Court, all the company records were destroyed. Fortunately, however, one Jaenike, an accountant attached to the F.B.I., had, during the course of the reorganization proceedings, made a meticulously careful transcript of all the books and records of the company, insofar as they bore on some seventeen items which then seemed subject to question. While his calculations as to them and their falsity were originally made primarily as of January, he was able during the course of the trial to carry these through to the time of the presentation of the April claims. Fortunately, in addition, Louis Ross, defendant's production manager, who, as this Court has previously said, was evidently trying his best to tell the truth

and who knew best of any one how "Precision's" work was progressing, was able to throw further light on the progress of such work from January to April. As a consequence, while not accurate to the penny, evidence was before the Court showing substantially "Precision's" and "Foundry's" inventory of both work done and materials on hand on the contracts in question, as of the time of the April progress payment invoices. A comparison of these, as above, with the amount of such items claimed, worked out at some pains by this Court, thus gives the amount of the false claims at that time. This amounts to $73,297.03. 80% of this amount was thus falsely paid out by plaintiff to defendant. Plaintiff was thus damaged to the extent of $58,637.62. But the statute grants double damages. These double damages thus aggregate $117,275.24. Adding thereto the $12,000 of forfeitures, the total damages are $129,275.24.

One Connors, who had a falling out with defendant Nathaniel Elin, which seems to have given rise to the investigation upon which the present case is based, also gave testimony as to certain items alleged to be false. These items were in part the very items testified to by Jaenicke and, in part, others. However, Connors stated that a substantial part of these items, false in January, had been made good by April, but he did not even hazard a guess as to what proportion had been made good. Because of the fact that it is thus impossible to determine exactly what the actual damage from these items was, as well as the fact that certain of same are already covered by the Jaenicke testimony, and come from the lips of a somewhat biased witness, this Court feels that such testimony is not sufficiently definite and reliable upon which to base an additional calculation of damage.

Defendant claims that the testimony of Walsh, one of the first Government inspectors, who approved the April inventory, taken as of March 31st, estops the Government from claiming any damages. However it is perfectly clear that Walsh simply took what he was given by the defendants themselves,—"as presented to me",—without attempting to verify same. It was the later verification, after questions were raised, which showed the falsities.

Defendant further claims these damages have been mitigated on the theory that the goods and labor for which the plaintiff made these advances were actually on hand in late May, when "Precision" and "Foundry" filed their reorganization proceedings. Defendant calls attention to the fact that the progress payment form incorporated in the contract provided "all materials and work for which such partial payment has been made shall, upon the making of such payment * * * become and remain the sole property of the Government."

■ But the short answer to this is, that not a particle of these goods ever reached the hands of the Government. Clearly, plaintiff's damages are not mitigated by something which plaintiff never received. Nickelsburg v. Commercial Credit Co., 3 Cir., 1924, 1 F.2d 183.

Furthermore, immediately following the above quoted sentence, the progress payment form provides that same "shall not be construed, however, as relieving the contractor from the sole responsibility for all such materials and work until acceptance of the finished articles required by the contract * * * or as a waiver of the right of the Government to require the fulfillment of all the terms of the contract. Upon final delivery to and acceptance by the Government of all articles provided for in the contract, the contractor shall be paid the remainder of the contract price * * *. Until final inspection and acceptance of all the articles required under the contract no prior inspection payment or act is to be construed as a waiver of the right of the Government to reject any such articles which are defective or which do not comply with all the requirements of the contract."

■ It is therefore clear that the Government was under no obligation whatever to accept a mass, or mess, of uncompleted diesel engines and pumps, but only to accept these materials when completed, so as to "comply with all the requirements of the contract". Since this never occurred, plaintiff was under no duty during the bankruptcy reorganization to accept this mass of uncompleted work. It was entitled to, as it did, claim in such reorganization the damages themselves, which included the money it had paid out.

■ Nor is the bankruptcy dividend received by plaintiff to be credited in mitigation of damages. Under the statute giving it priority in bankruptcy matters, Title 31, Money and Finance, U.S.C.A. § 191, plaintiff would have recovered exactly the same amount of dividend if there had been no fraud, i. e., if it had proved its claim simply for the amount of its advances made under the contract for the sums honestly due defendant. For this amount itself exceeded the amount of the dividend of $74,000. Thus the dividend in fact represented nothing returned to plaintiff, on account of its loss due to defendant's fraud.

■ Nor does the occurrence of the bankruptcy defeat plaintiff's claim for its above loss due to defendant's fraud. It was the falsity of defendant's claim which caused plaintiff to pay the money wrongfully. This payment occurred before the bankruptcy happened. The bankruptcy may have defeated defendant's hope to repay to the Government that of which the defendants had defrauded the Government. But it was their fraud which caused the payment, now lost beyond recall. "The maker of a fraudulent misrepresentation in a business transaction is liable for pecuniary loss caused to its recipient by his reliance upon the truth of the matter misrepresented, if his justifiable reliance upon the misrepresentation is a substantial factor in determining the course of conduct which results in his loss." Restatement, Torts, Sec. 546; Fidelity &

Deposit Co. of Maryland v. Krout, 2 Cir., 1946, 157 F.2d 912, 914; Northern Pacific Ry. Co. v. U. S., D.C.Minn.1946, 70 F.Supp. 836, 864.

An order for judgment for plaintiff against defendants American Precision Products Corporation and American Foundry and Castings Company, Inc. and Nathaniel Elin may therefore be entered in the amount of $129,275.24, with interest.

The facts herein stated and the conclusions of law herein expressed shall be considered the findings of fact and the conclusions of law required by Fed. Rules Civ.Proc. rule 52, 28 U.S.C.