Ray B. WOODBURY, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. No. 9403.

United States District Court
D. Oregon.

May 26, 1964.

Norman J. Wiener, King, Miller, Anderson, Nash & Yerke, Portland, Or., for plaintiff.

Sidney I. Lezak, Acting U. S. Atty. and Roger G. Rose, Asst. U. S. Atty., Dist. of Oregon, Portland, Or., for defendant.

KILKENNY, District Judge.

In the last analysis, I have before me a case where an individual has buried his personal fortune in the quicksands of a highly speculative development, justifiable only as a military outpost in times of great national peril.

For specific determination is the validity of defendant's counterclaims in which it is charged that plaintiff made, or caused to be made, certain false claims against the United States in violation of the provisions of the False Claims Act.[1]

Of the applications, on which the Government contends false claims were made, all were executed by the corporations, Aleutian Homes, Inc., and Kodiak Construction Co., but only application number

ber one was signed by plaintiff. All of the other applications were made up and signed by Lehman, an attorney and agent formally appointed by the respective corporations.

The Court has already concluded that it did not have jurisdiction of plaintiff's original claim against the United States.[2] The identical claims, under the False Claims Act, were included in a complaint filed, in the Court, by the United States against the plaintiff, and others, on April 24, 1959, (Civil No. 149–59). On proper motion, in the later case, it was held that the claims, insofar as they affected Ray B. Woodbury, constituted compulsory counterclaims under Rule 13(a) F.R.Civ. P. Over the objection of the United States, Woodbury was dismissed without prejudice from 149–59 on October 19, 1959. Later on October 23, 1959, the United States was permitted to amend its answer in this cause and file the aforementioned counterclaim against plaintiff. An Order of Default has been entered against defendants, Aleutian Homes, Inc. and Kodiak Construction Company, in Civil No. 149–59, they being the only remaining parties in said litigation. The claims in both cases growing, as this did, out of the same transactions, the causes were consolidated for this trial.

Since most of the pertinent, relevant and material facts are of record, in considerable detail, in the opinion reported in D.C., 192 F.Supp. 924, I shall limit this statement to those subjects which will make this opinion understandable.

In order to properly interpret the actions of the parties and properly construe the actions of Woodbury, it is necessary for the Court to place itself in the position of all parties at the time of the execution of the various instruments, in Seattle, Washington, on April 27, 1953.

The project for the construction of homes at Kodiak was in the making in 1950, 1951 and 1952. During that period of time plaintiff had expended a very sub-.

1. 31 U.S.C. § 231.

2. Woodbury v. United States (D.C.Or.) 192 F.Supp. 924, aff'd. Woodbury v. United States, 313 F.2d 291 (9 Cir. 1963).

stantial sum of money in surveying and preparing the building site at Kodiak. The record is crystal clear that the United States, initially through the Department of the Navy, later assisted by FHA, FNMA and HHFA, was the prime mover in the entire project. The Navy was desperately in need of housing for its personnel at Kodiak. At the insistence of the Department of the Navy and the Home Financing Agents of the Government, the Congress enacted what is commonly known as the CRITICAL DEFENSE HOUSING AREA ACT of 1951, 12 U.S.C. § 1701g–1 for the specific purpose of making loans on prefabricated housing, the exact type of housing that the agencies were discussing with plaintiff. Since houses were to be constructed in a wilderness area, it was essential that they be prefabricated, and shipped to Kodiak for fast assembly. Weather conditions in the Aleutian Islands were such, in the judgment of all parties, that housing could not be constructed in a normal manner in that area.

Early in 1952, FHA appraised the value of the project at $5,904,250.00 and issued its conditional commitment to Brice Mortgage Company to insure long range loans in the total sum of $4,706,400.00. Aleutian Homes, Inc. was incorporated to act as sponsor of the housing project. During that year it definitely appeared that financing from private sources, such as through the Brice Mortgage Company, was out of the question. The project was faced with great difficulties in construction and the highly speculative value of the homes at Kodiak, in the event the Navy might decide to move. Realizing that private financing was beyond the reach of the project, the parties concluded to go forward with an interim construction loan from HHFA. The final application for such a loan made by Aleutian Homes was approved in January, 1953, for $4,230,-900.00, this sum constituting 90% of the $4,706,400.00, long-term financing figure. To be remembered is the fact that the project still had an FHA appraised value of $5,904,250.00.

The record is replete with testimony that HHFA, and the other interested governmental agencies, would not permit Aleutian Homes, the sponsor, to act as the contractor. They insisted on the formation of another corporation, Kodiak Construction Company, to act as general contractor. However, Kodiak Construction had no contractual experience in the construction business. For that reason, the interested governmental agencies insisted on Kodiak splitting the "ball of wax" of $4,230,900.00 into four separate contracts with experienced builders: First, "A Supply Contract" with Alex B. Carlton, doing business as Carlton Lumber Company, for the purchase of prefabricated housing packages (the contract here under attack); Second, a site construction contract entered into with Pacific Alaska Contractors, Inc. for the preparation of the site; Third, a construction contract entered into with Leo F. Winans Co., Inc. for the erection of the prefabricated houses when delivered on the prepared site; Fourth, a transportation contract with Coast Line for the transfer of the prefabricated house packages and other materials from Portland, Oregon, to Kodiak. The total of these four contracts was $4,230,900.00, the exact amount of the construction loan.

The principal thrust of the Government's claim is that the Carlton contract was conceived in fraud and that all applications for payment of funds made under such contract were false, within the meaning of the False Claims Act. To be more precise, the Government charges that plaintiff and Carlton, simultaneously with the signing of the supply contract of April 27, 1953, executed a side agreement which changed the price of the individual house packages and substantially reduced the total contract price from that specified in the original contract. Plaintiff relies on the language of a certain letter purportedly addressed to the Kodiak Construction Company by the Carlton Lumber Company on the 29th of April, 1953. A proper foundation was never made for the reception, in evidence, of the letter,

Exhibit 1215. The offer of the letter must be rejected. However, I do not believe the reception, or the rejection, of the communication is of any particular importance. Both the plaintiff and Carlton concede, and the record is in accord, that they had an arrangement, similar in nature to the letter, prior to the signing of the contract. It provided that Carlton would give Woodbury, or his *alter ego*, Columbia Supply Co., what could be considered as a subcontract, to supply f. o. b. the dock at Portland, the necessary refrigerators, stoves, washers, electric wiring and equipment, plumbing materials and equipment, dryers, heating material and equipment in compliance with the plans and specifications for the 344 prefabricated homes. Furthermore, it was arranged that the job of rounding up this particular material and equipment would be placed on the plaintiff's shoulders and since Carlton was expertise only in the prefabrication area, he would accept, as his compensation, a fixed fee of $120,-000.00, plus what was the estimated cost of prefabricating the homes. That this arrangement between plaintiff and Carlton was known to the Government is beyond cavil. The agent, in charge of the negotiations leading up to the signing of this agreement, testified that Mr. Woodbury made this arrangement known to the Government, prior to the signing. The agent recognized that Carlton would necessarily subcontract the particular items and found no good reason why Woodbury shouldn't be the supplier. There was probably good reason why Carlton wanted to be relieved of the burden of supplying the fixtures and equipment. We must remember that this was during the Korean War period and that the threat of run-away inflation was ever present. A substantial rise in the cost of the electrical and plumbing supplies, equipment and appliances could well destroy any profit that might be made under the contract. The Government's charge that this arrangement was concealed is not supported by the evidence. Neither is the claim that the total of the Carlton contract was reduced, and that such re-duction was not shown on the application for progress payments as they were made. As part of its general charge of fraud, the Government claims that a profit of $743,111.66, or approximately 31% of the total, was made on the Carlton contract alone. Even if this was true, such a profit might not be unconscionable in view of the hazards of the risk. In any event, the Government's remedy, in such a case, would be at common law to set aside the contract, rather than charge a violation of the False Claims Act. On its computation of 31% profit, the Government would allow plaintiff only $469,312.55 as the cost of the items which he furnished. It is plaintiff's claim that the cost of these items would exceed $775,000.00. Using plaintiff's figures the profit would be reduced to approximately $443,000.00, without any charge for his own supervision. In other words, a profit of less than 20%. Profit or no profit, my task is to determine whether there were false claims filed by the plaintiff, as outlined in the Pre-Trial Order.

On the charge that plaintiff and Carlton entered into a side contract which voided the original Carlton contract and required claims to be filed on the basis of the contract between Carlton and plaintiff, I find against the Government. The evidence conclusively shows that the side contract was with Woodbury and his supply company, the Columbia Supply, and not with the Kodiak Construction Company. The open, unconcealed transactions between the parties, including the manner of paying the money directly to Columbia Supply by Carlton would indicate that no one, at the time of the payments, was of the belief that the transaction was clouded or tainted with illegality. For that matter, it is manifest that no one questioned the arrangements between Woodbury and Carlton, until after the Alaskan contract ground to a halt and after the completion agreement was made, pursuant to which Woodbury advanced substantial additional funds for the completion of the project. I find that the applications were properly made in the name of Carlton under the terms and

conditions of the original contract. The certification that a certain amount was due under the original contract did not constitute a false claim. The fact that Carlton may have tried to insure himself against loss by making a separate contract with Woodbury on a cost-plus fixed fee basis is, in my opinion, entirely beside the point. There is nothing in the instruments which I have examined which would require a written, or other disclosure, of such an arrangement. We must keep in mind that Carlton might not have signed the contract unless he knew, at the time of signing, that Woodbury would go ahead on the fixed fee basis. Nowhere in the Carlton agreement can I find anything which prohibited subcontracting, or the making of an outside agreement. Article XXII contains a certification that the contract constitutes the sole and entire agreement between the parties. This, of course, does not mean that thereafter the contracting party is not permitted to go forward with the tentative arrangements he may have previously made with reference to subbing some part of his obligation.

Having found that payments were properly made to the Carlton Lumber Company, it is of no importance what happened to such money after it arrived in the Treasury of that concern. Strong arguments have been made that substantial amounts were paid to Woodbury and that Woodbury used some of these funds for purposes unconnected with the project. There is evidence to support that view. Likewise, the record also supports the view that plaintiff eventually returned all of those funds, and considerably more, for use in this project. Even if this was an accounting suit, in which we applied the principles of equity, the hands of the plaintiff regained their cleanliness long prior to the commencement of this litigation.

The testimony of some of the witnesses that the HHFA loan to Aleutian Homes in the sum of $4,230,900.00 was to be devoted exclusively to the purchase of "nails, boards, and other building materials" and that no part thereof was to be devoted to travel expense, FHA fees, housekeeping costs, interest, etc. is of little help. It does not fit in with final arrangements, contracts and agreements between the parties. In order to get the job "on its feet" and complete construction of the Navy houses in 1953, it was necessary for Aleutian, the mortgagee under the construction loan, to make a contract with Kodiak for the precise amount of the loan. Then Kodiak, on the insistence of the defendant's agents, made four subcontracts totaling the precise amount of the loan. The fact that the construction of the project eventually cost some $100,000.00, above and beyond, the FFHA commitment conclusively demonstrates that "gray" or "profit" was entirely lacking and that no part of the funds paid under the Carlton contract were permanently devoted to the payment of anything but construction costs. Even if relevant and material to my problem, the temporary diversion of funds by plaintiff would not, as I find the facts, constitute a cause of action under the False Claims Act.

## LAW OF THE CASE

▇▇▇ The False Claims Act was never designed to reach every kind of fraud that might be practiced on the Government. United States v. McNinch, 356 U.S. 595, 78 S.Ct. 950, 2 L.Ed.2d 1001 (1958). In an action under the False Claims Act, the United States must prove that there was a false representation of a material fact made with knowledge of its falsity, which false representation must be believed and acted upon by the United States. United States v. Robbins (D.C.Kan.1962) 207 F.Supp. 799, 807. The proof by the Government must be by clear, explicit and unequivocal evidence. Proctor v. Sagamore Big Game Club, 265 F.2d 196, 202 (3 Cir. 1959); Hablas v. Armour and Co., 270 F.2d 71, 77 (8 Cir. 1959). Although some authorities support the view that an intent to defraud is not an element of an action under the Act, United States v. Toepleman (E.D.N.C. 1956), 141 F.Supp. 677, the better reasoned cases support the view that such in-

tent is necessary. United States v. National Wholesalers, 236 F.2d 944, 950 (9 Cir. 1956), cert. den. 353 U.S. 930, 77 S.Ct. 719, 1 L.Ed.2d 724; United States v. Schmidt (E.D.Wis.1962) 204 F.Supp. 540, 543, 544. The mere showing that a person has signed a false or incorrect statement and presented it for payment is not, in itself, sufficient to hold such person liable under the False Claims statute. The Government must go beyond that and show that the person intended that the signing would procure from the Government something to which the person knew he was not entitled. Proof must be had that such person intended, as a result of the signing of the statements, to defraud the Government. United States v. Park Motors (E.D.Tenn. 1952) 107 F.Supp. 168, 176. Furthermore, the Government must rely on such false representations. United States v. Robbins, supra. The Government cannot claim that it was defrauded by the false representations of another party where it has knowledge of the facts, prior to the payment of the claim. Sacramento Suburban Fruit Lands Co. v. Klaffenbach, 40 F.2d 899 (9 Cir. 1930). To be recognized is the fact that the last mentioned case is not a False Claims case. When a person has knowledge, such as the Government had in this case of the arrangement between Woodbury and Carlton, and no effort is made to prevent that person from making a full, adequate and complete inquiry into the exact terms of the transaction, such person will not be heard to say that he has been deceived to his injury by the misrepresentation of the person originally furnished the knowledge. Shappirio v. Goldberg, 192 U.S. 232, 241, 24 S.Ct. 259, 48 L.Ed. 419.

I find nothing in the cases cited by the Government which would require that I find the plaintiff guilty of violating the False Claims Act by taking over part of the Carlton contract. Typical of the cases cited is Smith v. United States, 287 F.2d 299 (5 Cir. 1961). The most that can be said of that case is that the trial judge, on the basis of the evidence submitted, found that Smith had violated the provisions of the Act. The Court of Appeals correctly concluded that it had no right or authority to upset the findings of the judge who had an opportunity to see and observe the witnesses and make a full analysis of the evidence in the light of his observations. United States v. American Precision Products Corp., 115 F.Supp. 823 (D.C.N.J.1953), according to the claim of the Government, is on "all fours" with the facts in the instant case. To my way of thinking, the facts in American Precision resemble our facts, in the same proportion, as resemblance of a lamb bears to that of a lion. All that was necessary for the Court to say in American Precision was that the principal defendant pleaded guilty to an indictment involving the same false claims as were before the Court in the civil action and that he was estopped, by the record, to deny civil liability. The discussion with reference to when an officer of a corporation may be charged with a violation of the Act, is in favor of the plaintiff, rather than supporting the view of the defendant. The Government's reliance on United States Ex Rel. Marcus v. Hess, 317 U.S. 537, 63 S.Ct. 379, 87 L. Ed. 443 (1943) is misplaced. Again, the appellate court was passing on a factual charge of collusive bidding which had been resolved against the bidders by the verdict of the jury. The relators case was based entirely on a charge of collusive bidding on the projects. The jury and the court found that the contracts were actually obtained by a successfully executed conspiracy to remove all possible competition from competitive bidding. The jury, the trier of the facts, found the charges to be true. It is there indicated that if the officers of the TWA had known of the collusive bidding the contracts would not have been awarded. We have no such factual background in this case. Here, the Government agencies had made their own estimates as to the value of the project. They were the ones who initiated and were urging the completion thereof. In the last analysis the

holding of the Supreme Court was sufficient evidence to justify the verdict against the defendant.

Here, I find no intent to defraud on the part of the plaintiff. The Hess case is authority, as argued by the Government, for the proposition that the chief purpose of the statute is to provide restitution to the Government of money taken from it by fraud and that the device of double damages, plus a specific sum, was chosen to make sure that the Government would be made completely whole. To the same effect was Rex Trailer Co. v. United States, 350 U.S. 148, 76 S.Ct. 219, 100 L.Ed. 149 (1956), the latter, however, dealing with the Surplus Property Act of 1944, which Act employed a device for the recovery of a specific sum on each charge, similar to the False Claims Act. The argument that the decision in the Hess case stands for the proposition that the showing of intentional fraud is unnecessary, is not borne out by an analysis of that decision. United States v. Ueber, 299 F.2d 310 (6 Cir. 1962). The author of the opinion said:

> "We do not think that because this case involves a statutory cause of action under the False Claims Act, the government is relieved from meeting the burden applicable to any fraud action, statutory or common law."

■ Considerable has been said in both the briefs and the arguments on whether a specific intent to defraud is· a necessary element of an action under the False Claims Act. Although many well reasoned cases seem to require such an intent, others do not. United States v. Toepleman, supra. This same authority recognizes the requirement of *knowledge* of the presentation of a false claim. I need only go so far as to say that there is no substantial evidence in this case that the plaintiff had knowledge of the making or the filing of a false claim. That the fraud of a principal agent is to be chargeable against his corporate employer is fundamental. United States v.

Comstock Extension Mining Co., 214 F. 2d 400 (9 Cir. 1954).

■ It does not follow that the fraud,. if any, of such an agent is to be imputed to an officer of the corporation, such as plaintiff. Neither Lehman nor his secretary were (*personal*) agents of Woodbury. To resolve the question, we must. again return to the requirements of the· act. No individual would be responsible· unless he *knowingly* participated in the· making of the claim. United States v.. Rohleder, 157 F.2d 126 (3 Cir. 1946),. cited by the Government, recognizes a. background of sufficient evidence to warrant the district judge in deciding that the principal had actual knowledge of the fixed bid. Actual notice or knowledge of the falsity of the claim is a condition to· liability under the Act.

## FRINGE CLAIMS

Aside from the Government's claim. that each application for funds should not: have been made under the original contract, after a portion thereof had been: assigned to Woodbury or Columbia Supply, other important claims, are asserted.. Tersely stated, these claims are as follows:

(1) That certain of the electrical appliances to be included in the complete house packages were not delivered f. o. b. dockside, Portland, at the time the respective applications were· made, which fact was not made known· to the Government.

(2) That Aleutian and Kodiak owed money for construction purposes to· certain creditors, which indebtedness the plaintiff failed to list or name in· the applications.

(3) That applications were made· after the Pacific Alaska contract had been terminated and such fact was not made known in the application.

■ (1) Numerous charges are· made against plaintiff by the Government that he wrongfully certified that certain· ranges, refrigerators, washers and dryers were dockside when, in truth and, in.

fact, said property was not dockside at the time of such certification. Here, again, there is an absolute failure of proof. Although the complete house packages were not loaded aboard the ships, and there is evidence to that effect, there is no substantial evidence that there was anything missing of the packages on the docks.

(2) The Government's charges that certain of the applications were false in that they did not list the names of creditors who might be eligible to file liens under the law of Alaska, are, in my judgment, supported by substantial evidence. In this connection, the only application which was signed by the plaintiff was number one. The testimony is undisputed that when this application was presented, the Government's personnel in Seattle, were fully informed of the fact that the bills were not paid and that the money received on the application would be used for the payment of the bills. I feel that plaintiff's conduct in signing the first application, under the circumstances, was excusable and that said application, although it did not list the names of certain outstanding creditors, was not a false claim within the meaning of the Act. The same reasoning, however, is not applicable to the making and presentation of the remainder of the applications. It is my finding that lienable claims, for substantial sums of money, were outstanding and were not made known in applications numbered 2, 3, 4, 5, 6, 8, 9, 10, 11 and 12.

The plaintiff, being the dominant figure in the enterprise, was instrumental in causing these claims to be filed. Without question he had knowledge of the fact that the lienable indebtedness was not listed in the applications. His contact with, and supervision of, Aleutian and Kodiak, was so closely related to securing the funds under the construction commitment that specific intent is not only indicated, but must be found as a fact. Intent may be presumed from the voluntary doing of a wrongful act. A person who knowingly disobeys the requirements of the False Claims Act, intending with bad purpose either to disobey or disregard that law, is acting with a specific intent. I find that the making and presentation of the last mentioned claims without mentioning the then outstanding lienable indebtedness was not due to mistake or inadvertence or any other innocent reason.

(3) Likewise, I find that plaintiff knowingly and with specific intent made and presented applications numbered 8, 9, 10, 11 and 12, in which claims were made that there was due and owing to Pacific Alaska Contractors, Inc., under its site construction contract of April 27, 1953, with Kodiak Construction Company, the sums mentioned in such applications. I find said applications were false. In truth, and in fact, Pacific Alaska Contractors had on the 8th day of August, 1953, discontinued all services and the performance of all work under said contract of April 27th, all of which was known to the plaintiff. Furthermore, plaintiff knew that the applications and requests for advances were not prepared on the basis of data furnished by, or under the instructions of, one W. H. Ostruske, as represented in such application for payment of funds under said Pacific Alaska Contractors, Inc. Plaintiff knowingly committed such acts of arranging for and making such false claims, intending with bad purpose either to disobey or to disregard the law.

To be recognized is the fact, demonstrated throughout the record, that plaintiff was acting under extreme pressure and that considerable of the pressure was caused by the representatives of Governmental agencies in their anxiety to push the project through to an early completion. Such pressure, and its resulting tension, does not justify the making and presentation of the applications which concealed from the Governmental agencies very material facts. In retrospect, it seems that the concealments, in themselves, accomplished nothing. No doubt, the money would have been paid even if the true facts had been reported.

## EFFECT OF COMPLETION AGREEMENT

After the construction on the Aleutian Homes Project came to a stop in the fall of 1953, the Government, and the various bonding companies made a complete investigation of all of the facts surrounding the project, including, but not limited to, all of the facts and circumstances surrounding the making and filing of the applications on which the Government now charges fraud. Subsequent thereto and on April 23, 1954, all interested parties, with the exception of the Government, signed what is known to the record as a Completion Agreement. In my original opinion, Woodbury v. United States, supra, I held that the Government was a party to that agreement even though the instrument was not formally signed by it. I held that contractual liability under a written contract might be assumed without a formal execution. My comments with reference to that transaction, as expressed in that opinion, are by reference made a part of my findings in this cause. I again find that the Government was a party to said agreement and was bound by the terms and conditions thereof. The Courts, in particular, and society, in general, favor the compromise and settlement of claims with the view of preventing protracted and highly expensive litigation. It is my view that the parties, by said agreement, intended to compromise and settle all controversies, such as the claims here in question.

## WAIVER AND ESTOPPEL

The record is undisputed that plaintiff, pursuant to the requirements of and in reliance on the Completion Agreement, expended substantial sums of money. The facts before me present a clear cut picture of waiver by the United States, as that principle is recognized and defined in Conzelmann v. N. W. P. & D. Prod. Co., 190 Or. 332, 225 P.2d 757, cited with approval in Miller, et ux. v. Barker, et ux., 233 Or. 113, 126, 377 P.2d 343 (1962). Consequently, the fraud, if any, practiced on the Government was waived.

Furthermore, the investigation by the Government, the execution of the Completion Agreement, the performance of that agreement by the plaintiff and other parties, present a classic background for the application of the doctrine of estoppel. While the doctrine of estoppel cannot be invoked against the United States, while acting in its governmental capacity, United States v. State of California, 332 U.S. 19, 67 S.Ct. 1658, 91 L.Ed. 1889, opinion supplemented 332 U.S. 804, 68 S. Ct. 20, 92 L.Ed. 382, rehearing denied 332 U.S. 787, 68 S.Ct. 37, 92 L.Ed. 370, United States v. City and County of San Francisco, 310 U.S. 16, 60 S.Ct. 749, 84 L.Ed. 1050, rehearing denied 310 U.S. 657, 60 S.Ct. 1071, 84 L. Ed. 1420, such a rule does not apply where the Government is acting in its private or proprietory capacity. United States v. Katz Drug Co., 150 F.2d 681 (8 Cir. 1945); Branch Banking & Trust Co. v. United States, 120 Ct.Cl. 72, 98 F.Supp. 757 (1951) cert. den. 342 U.S. 893, 72 S.Ct. 200, 96 L.Ed. 669.

## STATUTE OF LIMITATIONS

Finally, I conclude that the statute of limitations [3] bars all but one of the claims urged by the Government. Each of the claims, other than twelve, were made more than six years prior to the filing of the Government's counterclaims in this action. To be conceded, is the fact that the Government commenced another action in this Court, Civil 149–59, within the six year period. The plaintiff was made a party defendant in that action. Later, the Court arrived at the conclusion that the counterclaims of the Government, asserted against plaintiff in 149–59, were compulsory in nature and should be asserted in this action. An order was entered dismissing the Government's claim against Woodbury in

3. 31 U.S.C. § 235.

149–59. No appeal was taken from that order.

The six year period is to be computed from the time of the commission of the act. The "act" in question is the filing of the false claims. United States v. Borin, 209 F.2d 145, 147 (5 Cir. 1954); United States v. Euber, supra. This statute of limitations was originally part and parcel of the False Claims Act. It has been uniformly construed to bar not only the remedy, but also the right of action. Therefore, such a statute cannot be tolled. Canned Foods, Inc. v. United States, (1956) 135 Ct.Cl. 862, 146 F.Supp. 470, 472; United States v. Borin, supra; United States v. MacEvoy (D.C.N.J. 1950) 10 F.R.D. 323, 325.

The Government's argument that the order of dismissal in 149–59 was not appealable has little substance. First of all, it is my view that an appeal could have been prosecuted from that order. Next, it is my belief that the principles discussed in Brandt v. Renfield Importers, Ltd., 216 F.2d 206 (8 Cir. 1954) and Hardy v. Bankers Life & Casualty Co., 222 F.2d 827 (7 Cir. 1955) would not apply to a judgment of dismissal, which here, is based on the fact that the dismissed claim could only be prosecuted as a compulsory counterclaim in another action. Also, none of the cases cited by the Government, for example, Goldlawr, Inc. v. Heiman, 369 U.S. 463, 82 S.Ct. 913, 8 L.Ed.2d 39 (1962), involved a limitation which was part and parcel of the act which created the cause of action.

All exhibits, with the exception of 1215, on which ruling was reserved, are admitted in evidence and have been considered by me.

### DAMAGES

Under ordinary circumstances, it would be beyond the scope of this opinion, and pure dictum, to pass on the question of damages. However, my findings and conclusions may not meet with the approval of the Court of Appeals. If the appellate court arrives at a different result, it might desire my views on the issue of damages.

From all of the evidence in the case, I find that the plaintiff did not sustain damage by reason of what transpired on the Carlton contract, or otherwise. Plaintiff replaced, for use in completing the project, all funds that were diverted by him for temporary private use. For that matter, the plaintiff advanced for the use of the project, funds far in excess of any sums that he might have personally withdrawn under the Carlton contract, or otherwise.

If my findings and conclusions on the effect of the Completion Agreement, estoppel and the statute of limitations are in error, then the Government would be entitled to judgment against the plaintiff for a $2,000.00 statutory penalty on each of the claims, other than the first.

### ALEUTIAN HOMES CASE

The defendants in United States v. Aleutian Homes, Inc. and Kodiak Construction Company, a corporation, Civil No. 149–59, are in default and did not plead, or raise the effect of the completion agreement, waiver, estoppel or the statute of limitations. All those defenses are affirmative in nature and are not available to the defaulting defendants. Those corporations participated in filing the ten false claims on which Woodbury would be liable if he had not prevailed on his affirmative defenses. I again find that the Government was not damaged by the filing of these false claims or by any action of the corporations under the Carlton, or other contract. The Government is entitled to recover from these corporations the statutory penalty of $2,000.00 on each of ten false claims or a total of $20,000.00, together with its costs.

This opinion shall serve as my findings and conclusions.

Let Judgment be entered accordingly.