SACRAMENTO SUBURBAN FRUIT LANDS CO. v. KLAFFENBACH et al. *

No. 5858.

Circuit Court of Appeals, Ninth Circuit.

May 19, 1930.

*Rehearing denied July 13, 1930.

900

Butler, Van Dyke, Desmond & Harris, of Sacramento, Cal., and E. P. Kelly, of Minneapolis, Minn., for appellant.

Ralph H. Lewis and George McCutchen, both of Sacramento, Cal., for appellees.

Before DIETRICH and WILBUR, Circuit Judges, and NORCROSS, District Judge.

DIETRICH, Circuit Judge.

In its general background this case is similar to Sacramento Suburban Fruit Lands Co. v. Tatham (C. C. A.) 40 F.(2d) 894, this day decided, and other cases of the group therein referred to. It was commenced on August 15, 1927, and the alleged fraud relied upon was committed prior to February, 1921. Plaintiffs (appellees) allege that on or about March 4, 1921, at Muscatine, Iowa, where they then resided, they entered into a contract to purchase from defendant ten acres of the Rio Linda tract, near Sacramento, Cal., for $2,750, and that they were induced so to do by false and fraudulent representations to the effect that the land was fertile, was capable of producing all kinds of farm crops and fruits of all kinds in large quantities, and that it was of the value of $275 per acre. They aver that because the land was unfertile and underlaid with hardpan it was unsuited for these purposes and that, consequently, it was of a value not to exceed $15 per acre. They still further allege that relying upon the truthfulness of the representations they laid out over $11,000 in improving the land, and that if it were as represented with the improvements it would now be worth $12,000, but is, in fact, worth not over $2,000. Because of the dearth of proof upon the subject the court did not submit to the jury the question of indirect damages resulting from such expenditures for improvements. Apparently the jury found the difference between the actual or market value of the unimproved land and its value as represented to be $2,000, and the plaintiffs took judgment for that amount.

One of the principal questions presented by the exceptions and assignments is whether, in fact, plaintiffs relied upon the alleged false representations. Another, of major importance, is that of the statute of limitations, and in that respect it is agreed that the applicable statute provides a limitation of three years from the date of the discovery of the fraud, or the date when, acting reasonably, the plaintiffs should have discovered it. In their complaint plaintiffs allege that they "did not suspect or discover the falsity of the representations until on or about the 15th day of March, 1927."

Harry C. Klaffenbach (hereinafter named as plaintiff) testified that prior to 1921 he lived in Muscatine, Iowa, was by occupation a printer, and had never been in California. At the time of the transaction he was a little over thirty years of age. He had had a high school education and had gone to college where he specialized in scientific work. His attention having been drawn to the Rio Linda tract by newspaper advertisements and by his father-in-law, who apparently was the owner of a lot in the tract, he wrote to defendant for and received a booklet and other literature purporting to describe the tract and giving information intended to appeal to purchasers. From the testimony of neither him nor his wife, who is his coplaintiff, does it appear that any highly material oral representations were made to them differing from those found in this literature.

In the literature referred to defendant set forth the advantages of the location for a home, for the poultry industry, and for the raising of fruits. As to fruits it advised a diversified family orchard, but if production was desired for the market that a single variety should be selected after advising with the company's horticulturist. As to soil, the most specific statements, found in the booklet, were as follows: "The land all lies high and is practically level. The soil is friable clay loam of a chocolate brown color, well adapted to the growing of all deciduous fruits as well as olives and grapes." "A number of the tracts are being plowed and leveled and made practically ready for orchards." "We now extend to you an invitation to come to Rio Linda and see for yourself what our happy people are doing," etc. "Our people have planted a variety of fruit trees under varying conditions. Many of these orchards are in full bearing. As a result we know what fruits are best adapted to our various tracts of land as well as the district as a whole." "Practically every fruit grown in the United States can be grown here. The soil of the Rio Linda district is a friable loam * * * and is especially adapted to fruit-raising." "For income purposes select one or two kinds of fruit for which your particular soil may be best adapted and specialize on that fruit," etc. What purports to be a letter from the company's horticultural advisor, with whom purchasers were directed to consult, was incorporated, and in this letter it is said: "As to the top soil it is, generally speaking, a friable loam known here as sandy clay loam, ideal for ir-

rigation. * * * With reference to the subsoil, will state that, generally speaking, wherever the clay soils exist in California the subsoil is found to be hard and closely packed, varying in texture and character, much of which contains such necessary minerals as lime, phosphorous, iron, and gypsum. We sometimes advise blasting to shatter this subsoil, securing better drainage and more freedom for tree roots. As these conditions vary somewhat it becomes my duty and pleasure to advise with you clients as to just which treatment each individual tract requires as the development is planned and started. The heavy bearing, thrifty orchards at Rio Linda are a convincing and sufficient demonstration of what can be done on your lands" etc. In another letter, dated July 30, 1920, purporting to have been written by the county horticultural commissioner to the company, and set forth in the booklet, the writer says: "The splendid growth and the excessive yield obtained during the last five or six years has proven beyond a doubt that this district is well adapted for the commercial growing of almonds, pears, peaches, olives, cherries, grapes, plums, figs and berries."

In a circular letter, which apparently was sent with the booklet, containing much "dealers' talk," it is said that, together with other considerations which induced the company originally to purchase the tract, was "the wonderful soil and its adaptability for growing highly profitable crops every month in the year." But toward the end of the letter: "We realize that any land investment is an important matter to you, and when as far away as California, it requires careful consideration on your part. * * * We urge and invite you to go to Sacramento with one of our parties and investigate every statement we make."

As is disclosed, plaintiff, an intelligent man and not without a measure of business shrewdness and caution, was unwilling to act upon the representations so made in what is generally known as "promotion literature." Upon receiving this literature and a personal letter transmitting it, he wrote, of date December 21, 1920: "As yet I cannot make any statement, whether I will take up with the proposition or not, at least until an investigation is made and I am able to talk it over with my father-in-law." And again on December 28, 1920, responding to another letter from defendant's sales manager suggesting that he take an option to purchase, he wrote: "As yet can make no promises, as I will have to see for myself before I can take up with any proposition." Accordingly, "to see for himself," about two months later he went to California in company with his father-in-law, and at Sacramento he met some of defendant's agents and spent three days or more going about and investigating the tract and other nearby settlements. Strangely enough, though, as shown by the letter above referred to, he was unwilling to act upon the representations made by the company in its literature, his testimony is to the effect that he unquestionably and implicitly accepted as true everything any one of its agents told him. Equally remarkable is it, if his testimony is to be credited, that while there for the definite purpose of determining whether he would make the purchase, he gave less attention to land within the tract than to the surrounding country. And further, from his testimony as a whole, seemingly he was careful to refrain from making any inquiry touching either the value or the productivity of the land. Each of the days he was there he, with others, was on the tract. He made no borings to determine the depth of the soil but he observed that the compacted clay, referred to as hardpan, was disclosed in places along the roadway. On cross-examination, he stated that he may have thus spent four or five days instead of three. He also spent several days in Southern California, all the time having in mind fruit lands and making inquiries relative thereto. Though as we have seen, defendant's literature contained what purported to be a letter of the county "horticultural agent" commending the enterprise and an indorsement by the Sacramento Chamber of Commerce numerously signed, he made no inquiry of any of those persons, or of any banker, business man, realtor, or fruit grower. Some interviews apparently he had with people who lived on the tract or near by, the precise nature of which is not disclosed, but he was sure that he inquired of no one, other than defendant's agents, touching the character of the soil or land values, and made no investigation relative thereto.

Soon after his return to his home in the East he executed the contract without having further conversations with any of defendant's agents. With his family he moved to California in July, 1922, and after building his house, moved on to the land in the early spring of 1923, where he has continued to reside up to the present time. Prior to moving to the land he sunk a well and set out trees, and in both operations hardpan was disclosed. Some of the trees set at this time and in ensuing years died, but, according to his testimony, he made no inquiry other than

of defendant's agents. This, notwithstanding the fact that on July 1, 1922, he advised defendant's secretary, at Sacramento, to hold his mail sent in its care "owing to the fact that I will soon arrive in Sacramento to investigate the ranch proposition more carefully and very likely start in improving my lot."

During the year 1926 and the early part of 1927, plaintiff was evidently considering a sale of the property and communicated on the subject with various agents of the defendant, and also with one Whitcomb, who seems to have been a realtor in Minneapolis, Minn. Desiring to employ the services of the latter in making a sale, he wrote to him on January 10, 1927, inclosing a detailed description of the premises. In this statement, among other things, he represented that the property is "about three miles or so from trading center and to Sacramento, California." Distance to school and churches about three miles. On bus line for school. Nearest neighbor right across the road. Power and lighting electric. He further represented that: Five of the ten acres was developed, and that "all the soil is tillable and can be irrigated." Good drainage, "irrigation system satisfactory for overhead as well as flooding." The irrigation system is described: "Ample water in well. House supplied with water throughout as well as numerous stand pipes. Overhead pipe lines in poultry yards and permanent lawn sprinklers." "Water supply adequate in summer as well as winter." There follows a detailed description of elaborate equipment for poultry-raising. "Orchard: known as family orchard; admirably located, consisting of the following trees: cherries, apples, crabs, apricots, peaches, quinces, nectarines, persimmons, olives, mulberries, plums, prunes, pomegranates, jujubes, variety of figs, loquats, oranges, lemons, grapefruit, etc. Many of these are now bearing. Irrigation system for taking care of these. Small fruits: loganberries, raspberries, thornless blackberries, etc. Nut trees: English walnuts, almonds, filberts, pecans, chestnuts, pistachio and ginko. Shade trees: abundant; exotic trees of beauty, evergreen, coniferous and deciduous. Palms abound on the frontage of the five acres. Shrubs: numerous and beautiful which beautify the place." Also vegetable garden and flower garden. All covered by irrigation system. "Grapes: some sixteen or more varieties, principally for family use. Thus giving long season for grapes. Spacious lawns. Underground lawn sprinklers around the house; and large lawn in front of the house. Climate: considered good and healthful. * * * Land surrounding: value has increased considerable in the past few years. Adaptability of ranch: can be greatly enlarged." Mail delivered daily. Egg association affords co-operation advantages for shipping eggs and buying grain. The roadways around the premises are good. The statement also contains a description of the house, and other matters of greater or less importance.

It must be assumed that this statement was intended to be correct and truthful for plaintiff took the precaution to say in another letter that he did not want any misrepresentations made in procuring a purchaser.

In passing, we may say that we do not understand that in point of requisite soil properties and conditions there is any distinction between adaptability for growing of fruits and other products for family use and growing them for sale. If land will successfully produce a certain kind of fruit for family use, there is no apparent reason why it should not produce the same fruit for commercial purposes. The difference is one of magnitude of production or in the land area devoted to such purposes.

In the letter transmitting this statement he fixed a price of $8,750 for the improved five acres and $1,750 for the unimproved five, and inferentially authorized his agent, who was cautioned to make no untrue statement, to represent these as reasonable values. As to the unimproved five acres, he explained that "the company is getting $400.00 to $450.00 per acre for land in close proximity and it is not so good." Just how, about two months later, as alleged, it was revealed to him that the unimproved lot, thus priced at $350 per acre, was in fact worth only $15, or the whole parcel thus priced at $10,500, was worth not to exceed $2,000, is not clearly disclosed.

■ While some of the facts thus set forth may be only remotely relevant, questions such as are under consideration are more justly decided in the light of all the surrounding circumstances. As we have seen, plaintiff was an intelligent, cautious man. He did not act upon impulse or in an emergency, or at a distance. He was unwilling to accept the statements put out by the defendant through its literature but went to the land to see for himself. The land was in a populous community where bankers, business men, realtors, fruit-growers and horticulturists were readily accessible. Defendant concealed no facts and closed no avenues of inquiry. Plaintiff

had had some training in the sciences and had knowledge of the existence of hardpan, the element which he now contends made the land practically worthless. As to the effect upon the adaptability of the land for fruit growing, experts probably differed then as they differ now. For that reason, a representation that the land was suitable for fruit growing to some extent of necessity involved the expression of an opinion and the exercise of judgment. It is not a case of breach of warranty but of fraudulent inducement. Plaintiff having declined to accept defendant's representations and instituted an independent investigation cannot, under the circumstances we have related, now be heard to say he relied solely upon defendant's representations. Some emphasis is placed on the fact that in the booklet it is stated that the tract "has proven itself well adapted to the growing of most all fruits," but the "proofs," as pointed out, consisted of the trees, vines, and other vegetation grown or growing upon the tract and other lands in the general vicinity. These were observable, and plaintiff saw them. In short, he had knowledge, from a personal investigation, of the facts from which defendant drew its conclusion.

█ In the Melin Case (C. C. A.) 36 F.(2d) 907, we discussed some aspects of this question and while under the circumstances therein shown with some hesitation we held that the issue was for the jury, we recognized that it rested upon very narrow ground. Under the circumstances here we feel constrained to hold such an issue was not presented, and that the court should have directed a verdict for the defendant. In Pomeroy on Equity Jurisprudence, (3d Ed.) § 893, the learned author, after stating that one who, after having false representations made to him, actually learns the real facts, cannot claim to have been misled, adds: "The same result must plainly follow when, after the representation, the party receiving it has given to him sufficient opportunity of examining into the real facts when his attention is directed to the sources of information, and he commences, or purports or professes, to commence, an investigation. The plainest motives of expediency and of justice require that he should be charged with all of the knowledge which he might have obtained had he pursued the inquiry to the end with diligence and completeness. He cannot claim that he did not learn the truth and that he was misled."

The text is supported by many decided cases, of which we are content to cite the following:

In Hackleman v. Lyman, 50 Cal. App. 326, 195 P. 263, 264, the court said: "If a purchaser of real estate visits the property prior to the sale and makes a personal examination of it; touching representations made as to its quality, character, or condition, he will be presumed to rely, not upon the representations, but upon his own judgment in making the purchase, provided the vendor does nothing to prevent his investigation being as full as he chooses."

In Shappirio v. Goldberg, 192 U. S. 232, 241, 24 S. Ct. 259, 261, 48 L. Ed. 419, the court said: "When the means of knowledge are open and at hand, or furnished to the purchaser or his agent, and no effort is made to prevent the party from using them, and especially where the purchaser undertakes examination for himself, he will not be heard to say that he has been deceived to his injury by the misrepresentations of the vendor."

See, to the same effect, Slaughter, Administrator, v. Gerson, 13 Wall. 379, 383, 20 L. Ed. 627; Southern Development Co. v. Silva, 125 U. S. 247, 8 S. Ct. 881, 31 L. Ed. 678; Farrar v. Churchill, 135 U. S. 609, 10 S. Ct. 771, 34 L. Ed. 246; Farnsworth v. Duffner, 142 U. S. 43, 12 S. Ct. 164, 35 L. Ed. 931; McClure v. Glady Fork L. Co. (C. C. A.) 183 F. 84.

We are also of the opinion that the alleged cause of action was barred by the statute of limitations. Under the circumstances to hold otherwise would, in effect, be to nullify the statute and frustrate the public policy which it embodies. Manifestly, as early as 1923, if not before, plaintiff must have had full knowledge of the soil structure, of the hardpan and its proximity to the surface and its depth. Considering his training, his apparent business capacity, his disposition to see for himself, his contacts with numerous people of different classes, it is hardly conceivable that he would make no inquiry. If he did not do so, it must be held that he was wanting in the exercise of reasonable care.

Reversed, with directions to grant a new trial.