**UNITED STATES of America**

v.

**Harry H. GOLDBERG and J. Jacob Shannon & Co., a Corp.**

**Civ. A. No. 12544.**

United States District Court
E. D. Pennsylvania.

Jan. 9, 1958.

Alan J. Swotes, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

Robert H. Malis, Philadelphia, Pa., for defendants.

VAN DUSEN, District Judge.

This action was commenced by the United States under 31 U.S.C.A. §§ 231 and 233, commonly known as the False Claims Act. Pursuant to a request by the Government and a stipulation entered into by the parties, an Amended Complaint was filed setting forth an additional Count, which, in substance, alleged payment by the Government of rents in excess of the maximum annual rate of 15% of the fair market value of the demised premises. 40 U.S.C.A. § 278a.

Events leading to this controversy began in the spring of 1945, when representatives of the War Assets Administration approached Mr. George Stein, an employee of the defendants, and offered to lease the premises at 525 West Clearfield Street in Philadelphia.[1] The lease was finally executed by Mr. Goldberg in the latter part of July 1945 for $2,500 per month for the period of one year, with an option to renew from year to year. The property was needed by the Government for sales of surplus war assets and it had been impossible for it to locate a similar property which it could

---

1. This property is described in great detail in the notes of testimony. It contained approximately 148,000 square feet, with a number of buildings erected thereon, and was served by two railroad sidings (see diagrams marked as Exhibits D–2, D–3, D–7, D–14 and D–16).

use. Mr. Goldberg, only a short time prior to this (March 1945), had successfully ejected the Cleveland Wrecking Co. by an action in the Pennsylvania state courts, with the view to using the property in his business of selling heavy machinery.

Plaintiff's theory under the False Claims Act, supra, is that during the negotiations for the lease, Mr. Goldberg was told that the Government was prohibited by law from paying more than 15% of the fair market value as yearly rental and that, with such knowledge, Mr. Goldberg submitted two appraisals (Exhibits P-2 and P-3) representing the fair market value to be $200,000, whereas the actual value was only $50,-000. The record contains a great deal of conflicting testimony as to whether Mr. Goldberg was told of the 15% requirement. The weight of the probabilities is that Mr. Goldberg did not realize the importance of 40 U.S.C.A. § 278a, limiting the maximum rental to 15% of the fair market value, assuming this requirement was stated to him. He delegated the problem of leasing this property to Mr. George Stein, who secured the appraisals and attended to all the details. Also, in this connection, the Government was desperate to obtain a suitable property and it is not likely that its representatives were too demanding and particular with Mr. Goldberg when they had not been able to locate an alternative suitable property. The lease of this property for these war asset sales and for storage was necessitated by the problems of over-supply facing the Armed Services after VE Day (May 1945).

Also, the Government asserts that it was induced to enter into the lease transaction by relying on Mr. Goldberg's appraisals (P-2 and P-3), as a result of which vouchers submitted by the defendants for rent were paid out of the United States Treasury. The individuals preparing these appraisals were not called as witnesses. Assuming, without deciding, that failure to produce these witnesses shows their lack of qualifications, it does not show that Mr. Goldberg controlled their appraisals.

The Government argues that intent to defraud has been proved by showing that Mr. Goldberg submitted the appraisals stating the value to be in excess of $200,-000, while only a short time before he had offered the property to the Cleveland Wrecking Co. for $50,000. Suffice it to say that the trial judge believes that this offer was made only to avoid years of ejectment litigation required to secure possession and for the purpose of settling a family quarrel.[2] For this reason, it has virtually no bearing on fair market value in July 1945.

Due to the conditions which prevailed during the war, there were few real estate transactions on which to base the value of the Clearfield Street Property. The scarcity of building materials and labor reduced activity in the real estate market. Following VE Day in the spring of 1945, there was a marked increase in real estate activity in the Philadelphia area, particularly with respect to commercial properties. The greatest number of comparable sales took place after 1945. This is not to say that the Government's evidence relating to the acquisition of the property by Mr. Goldberg or the earlier appraisals and sales are totally immaterial. The record shows that this property was sold to Mr. Goldberg in 1943, when the market was "down," by the Girard Trust Company, as trustee of sundry trusts, following the foreclosure of a mortgage[3] (N.T. 302 ff.) and that the lease by that trust company to the Cleveland Wrecking Co. for $208. per

---

2. Cleveland Wrecking Co. was owned by the Rose family, a member of which was about to become Mr. Goldberg's son-in-law (N. T. 446, 789ff.). Lengthy ejectment proceedings proved necessary before Mr. Goldberg could secure possession of this property from the grantor's lessee when the "family sale" did not take place.

3. This sale, subject to an unfavorable lease, was for $45,000, being the amount unpaid on the mortgage which the trust company had foreclosed in securing title to the property.

month (Exhibit D-8) did not produce enough income to pay the tax assessments (N.T. 424).

The trial judge has carefully considered the testimony of the Government's real estate experts, who testified frankly and helpfully, but rejects their opinions for the reasons stated in Exhibit A attached hereto.

W. S. Supplee and H. LeRoy Kister testified, as witnesses for the defendants, as to the replacement value of the buildings without regard to the value of the land. Mr. Supplee inspected the property in 1947 and, to relate his figures to 1945, Mr. Kister, by use of a chart (Exhibit D-15), showed the rise in building and labor costs for the two-year period. By these two witnesses, the defendants offered to show that the replacement cost of the buildings as of 1945 was $110,000. (N.T. 619).

At the trial, counsel for the Government urged that the testimony of these two witnesses be stricken as not bearing on fair market value and also on the ground that they had not become familiar with the property until much later than 1945. This objection is overruled, but the arguments in support of the motion have been considered in evaluating the weight of the testimony, although they do not preclude its admissibility. See 3 Wigmore, Evidence, § 720. Cf. Travelers Indemnity Co. v. Plymouth Box & Panel Co., 4 Cir., 1938, 99 F.2d 218.

Mr. Solis-Cohen, who testified for the defendants,[4] was of the opinion that industrial property of the type involved here was commanding 70¢ a square foot in the summer of 1945.[5] To substantiate his opinion as of that time, he referred to transactions which demonstrated the activity in industrial real estate which followed VE Day of World War II. Specifically referred to were pieces of land at Delaware and Snyder Avenues, which in 1948 sold for 70¢ a square foot (N.T. 645), and Delaware and Mifflin Street, which sold for 80¢ a square foot in 1947 (N.T. 654).[6] From all the testimony, these two properties seem to be most like the Clearfield Street property with respect to size, location and utility.

The sales of all these properties were later than the lease by Mr. Goldberg and it must be assumed that a better price was obtained than would have been received for the properties in 1945, due to the continuing rise in the market.

According to the testimony of Mr. Solis-Cohen (N.T. 688), the market began to rise in 1945 and continued until the winter of 1946, when it became more stable. The trial judge finds that his appraisal of 70¢ a square foot as of July 1945 was high and determines that, on the basis of all the evidence, the fair market value of the land in July 1945 was 65¢ per square foot. However, the valu-

4. Although he did not appraise the property until the time of trial, the trial judge feels that Mr. Solis-Cohen was the most qualified expert witness appearing at the trial, and much weight has been given to his testimony.

5. In arriving at his opinion, Mr. Solis-Cohen used, among others, the following facts, which existed at or prior to the execution of the lease: (1) selling prospectus prepared by the Girard Trust Company; (2) observation of the property in 1945, although not for the purposes of an appraisal; (3) his knowledge of market conditions in 1945; (4) the extent of the repairs made to the building; (5) sales and appraisals of commercial properties made by himself and known to him during 1945. (See affidavit of J. Solis-Cohen, Jr., filed with the court on April 17, 1957, Document No. 23 in Clerk's file.)

6. Mr. Solis-Cohen also pointed out that land on the north side of Erie Avenue at G. Street had been sold in 1946 by the Philadelphia Electric Company for 65¢ a square foot (N. T. 654–657). He testified to several sales of land occupied by buildings to support his appraisal of this property (land and buildings) at approximately $180,000 in July 1945. For example, he mentioned a sale of a 35,000 square foot property at 24th and Washington Avenue on 2/4/46 for $107,200 and a sale of a 40,000 square foot property at 23rd and Carpenter Streets in 1950 for $141,500.

ation of the buildings by this witness at $75,000 (N.T. 661) is accepted,[7] and the trial judge finds that the fair market value of the entire premises as of July 1945 was $171,200 (65¢ x 148,000 sq. ft. equals $96,200, plus $75,000).[8]

The above mentioned finding of the fair market value of this property in July 1945 has been based on the principles adopted by the United States Court of Appeals for the Third Circuit in these cases: United States v. Certain Parcels of Land in City of Philadelphia, 3 Cir., 1944, 144 F.2d 626, 628–630, 155 A.L.R. 253; United States v. 13,255.53 Acres, etc., 3 Cir., 1946, 158 F.2d 874, 876; Hickey v. United States, 3 Cir., 1953, 208 F.2d 269, 273–274, 278–279, certiorari denied 1954, 347 U.S. 919, 74 S.Ct. 519, 98 L.Ed. 1074. See, also, Wigmore on Evidence (3rd Ed.), § 463 (Vol. II, pp. 503ff.).

The two counts brought by the Government will be considered separately:

## Count I

■■ Intent to defraud is a necessary prerequisite to civil liability under the False Claims Act (31 U.S.C.A. §§ 231 ff.). United States v. Park Motors, D.C. E.D.Tenn.1952, 107 F.Supp. 168; cf. Lambert v. People of State of California, 1957, 78 S.Ct. 240. The trial judge finds that the plaintiff has failed to sustain its burden of showing this requisite intent. Aside from the question of fact involved, it has been firmly established, as a rule of law, that a representation of value expressed as an opinion cannot form the basis for an action of fraud. Gordon v. Butler, 1881, 105 U.S. 553, 6 L.Ed. 1166; In re Bowen, D.C.E.D.Pa. 1944, 58 F.Supp. 286, affirmed 3 Cir., 1945, 151 F.2d 690. Assuming, for the

purpose of argument, that Mr. Goldberg had the requisite intent to defraud, it is clear that the Government did not rely on these appraisals alone. In September of 1945, the Government began an inquiry into the entire transaction,[9] at which time a hearing was held in the Lafayette Building in Philadelphia. The rent for the first 45 days of occupancy was withheld pending the outcome of this inquiry. On October 15, 1945, when the matter was being investigated by the Department of Commerce, the first rental payments were made (see Exhibit P–18). These payments were made even after Mr. Goldberg had offered to cancel the lease when he was called in September 1945 to testify, as part of the above investigation, at the Lafayette Building (N.T. 738). Therefore, the Government cannot charge that it was defrauded by the false representations of another party where it has made an independent investigation prior to paying any money to defendants. Sacramento Suburban Fruit Lands Co. v. Klaffenbach, 9 Cir., 1930, 40 F.2d 899; In re Bowen, supra.

## Count II

■■ As to the second count of the Complaint, the trial judge is of the opinion that the Government may recover the amounts paid in excess of 15% of the fair market value prescribed in 40 U.S.C.A. § 278a. United States v. Wurts, 1938, 303 U.S. 414, 58 S.Ct. 637, 82 L.Ed. 932; United States v. Gudewicz, D.C.E.D.N.Y. 1942, 45 F.Supp. 787. The right to sue for such recovery is independent of a statute, United States v. Wurts, supra, and it is not based on a theory of recission. As the United States Supreme Court has stated: "Men must turn square corners when they deal with the

---

7. The trial judge has not overlooked Mr. Boyer's uncontradicted testimony that the lumber shed was never made weather-tight as promised by defendants and did not suit the plaintiff's purposes. The plaintiff was apparently willing to accept the property in spite of this defect.

8. Another factor weighing in this consideration is the fact that Mr. Goldberg needed this property in his business

and that it was extremely important to the Government to acquire a suitable site for their sales of surplus war assets. Mr. Goldberg had to acquire another city property for his business purposes as a result of leasing the subject property.

9. Shortly thereafter, an additional investigation was conducted by the F. B. I.

Government," Rock Island, A. & L. R. Co. v. United States, 1920, 254 U.S. 141, 143, 41 S.Ct. 55, 56, 65 L.Ed. 188. The Government is never bound by the acts of its agents in doing what the law does not sanction or permit. Cummings v. Societe Suisse Pour Valeurs de Metaux, 1936, 66 App.D.C. 121, 85 F.2d 287.[10]

■ Defendant argues that the $30,000 which was to be paid yearly by the Government represents more than rental payments, as it was also in consideration of repairs made by Mr. Goldberg and services rendered by his company during the surplus property sales and that, since § 278a contemplates only simple lease transactions, it is inapplicable to these facts. The record indicates to the trial judge that the repairs to the property made by defendants represented a condition precedent to the lease transaction. Defendants have not established their burden of proving that the other services referred to by them were either contemplated by the lease or rendered.

■ In the alternative, defendants rely on the application of § 278b, which excepts certain vital leases during war or emergency from the operation of § 278a. Defendants have the burden of proving the applicability of this language. The wording of § 278b applies only " * * * to such leases or renewals of existing leases * * * as are certified by the Secretary of the Army or the Secretary of the Navy, or by such person or persons as he may designate, as covering premises for military, naval, or civilian purposes necessary for the prosecution of the war or vital in the national emergency." Defendants have not shown that this lease was so certified or that the premises were "necessary for the prosecution of the war or vital in the national emergency."[11]

For the foregoing reasons, the Government is entitled to recover $3,070 (with interest at 4% yearly from December 30, 1946, and costs [12]), computed as follows:

| | | |
|---|---|---|
| Amount paid by the Government | $28,750.00 | (N.T. 463) |
| 15% of $171,200. | 25,680.00 | |
| | $ 3,070.00 | |

---

The last two monthly payments on the lease in the total amount of $5,000 were made on December 30, 1946 (Exhibits P–10 and P–11).

All Requests for Findings of Fact and Conclusions of Law inconsistent with the foregoing are denied.

### EXHIBIT A

Mr. Schulte, a witness for the Government, testified that he had appraised the property as early as 1938 and as late as September 1943 (N.T. 284), at which time he placed his valuation at $45,000 (N.T. 291).[a] Together with his personal inspection of the property, the witness also used prior sales as a basis for forming his opinion (N.T. 288 ff.). While these properties were not described in detail, it seems to be apparent from the record that none of them compared in size to the Clearfield property nor were the buildings of the same type. It should also be noted that these sales were in 1941 and 1942, which was at least three years prior to the time at issue here.

10. Although defendants have requested a dismissal for failure of the Government to return certain documents, the trial judge finds they have not been prejudiced thereby, since there is no showing that the documents relate to the question of fair market value.

11. The effect of the Surplus Property Act, 50 U.S.C.A.Appendix, § 1611 et seq., upon 40 U.S.C.A. § 278a need not be considered since the lease was not "certified." See, also, Opinion of June 14, 1956 in this case, 159 F.Supp. 151 at page 154.

12. See 28 U.S.C.A. §§ 2411(b) and 2412.

a. This is less than the appraised value of $92,000 (N.T. 290–1).

While this factor does not rule out their consideration as the basis of an opinion, it does affect the weight to be given to these prior, war-time sales, whereas the real estate market was different in 1945.

Mr. Schulte placed the value as of 1945 at $47,000 by plotting the purchasing power of the dollar and adding that coefficient to his earlier appraisal, in addition to considering his knowledge as to the existing market conditions. He regarded his attempt to evaluate as of 1945 as empirical (N.T. 304). The trial judge recognizes Mr. Schulte's experience and ability as an appraiser, but believes his testimony of the trend in industrial real estate values from 1/1/45 to 1947 is not applicable to this property on the basis of sales of similar properties during this period appearing in this record.

Mr. H. D. King, another witness for the Government, appraised the property for the Government in December 1945 (N.T. 334). He placed a value on the land of 10¢ per square foot or a total of $15,000.[b] The trial judge believes that his estimate as to the value, which was admittedly not based on actual sales of comparable property, was too low. Also, this opinion fails to adequately reflect the location of this property in relation to the public transportation facilities and railroad sidings. On the buildings, Mr. King placed the figure of $35,000 (N.T. 336–343). This value does not consider sufficiently the testimony that, as a condition of the lease, by December 1945 $18,000 had been expended for repairs which returned the buildings to a state of good repair, except for the lumber shed.

The last Government expert was G. Franklin Jones, who appraised the Clearfield Street property on September 20, 1943, for $48,500 (N.T. 376). He testified that the value as of 1945 could possibly have been $55,000 (N.T. 381). Mr. Jones considered prior sales of other property, but, as with Mr. Schulte's examples, the areas involved in such sales were not entirely similar to the property in question with respect to size and utility (N.T. 377–384). Mr. Jones did not appear to give much consideration to the railroad facilities nor the loading platform, which the trial judge feels are factors deserving substantial consideration when dealing with a large commercial property of this type. Moreover, in 1943 he gave the buildings very little value due to their deplorable condition (N.T. 397). However, he did state that if the warehouse were repaired, the value would have been very much increased (N.T. 398), although he was unable to say how much without seeing the property after the repairs.

b. Mr. King stated that "Modern Warehouse" space was then bringing 40¢ per square foot in that area (N. T. 336).