**UNITED STATES of America,**
**Plaintiff,**
**v.**
**E. C. ROBBINS and Richard W. Robbins,**
**Defendants.**
**Civ. A. No. T-2197.**
United States District Court
D. Kansas.
July 16, 1962.

Newell A. George, U. S. Atty., Topeka, Kan., Wilbur G. Leonard, Sp. Asst. U. S. Atty., Topeka, Kan., for plaintiff.

Malcolm Miller, Foulson, Siefkin, Powers, Smith .& Eberhardt, Wichita, Kan., for defendants.

WESLEY E. BROWN, District Judge.

The United States of America filed its complaint upon a claim of the Commodity Credit Corporation, a wholly owned government corporation, in the above entitled action against E. C. Robbins and Richard W. Robbins to recover double damages and forfeitures pursuant to 31 U.S.C.A. § 231. The complaint was filed February 28, 1959. The defendants, E. C. and R. W. Robbins were general partners in the Robbins Ranch with ranching operations in Comanche, Kiowa and Chase Counties, Kansas. E. C. Robbins resided at Belvedere, Kansas, while R. W. Robbins resided at Pratt, Kansas.

Briefly summarized, it is the contention of the United States that the defendants through E. C. Robbins and their manager, Evan Koger made applications dated October 24, 1956, and October 12, 1956, for assistance under the Emergency Feed Program of the United States. It contends that it has suffered damages in the amount of $4,273.35 because the defendants' applications referred to above and claims for assistance were false, fictitious and fraudulent. It demands judgment against the defendants in the amount of $8,546.70 plus such additional forfeitures as provided by law in 31 U. S.C.A. § 231 and all costs and such other general equitable relief to which the court deems it to be entitled.

The defendants denied that they had made a false claim as alleged by the United States; stated that their applications were made to Farmers Home Administration on its forms; that the statements contained in the forms were true; and that they were entitled to participate in the Emergency Feed Program.

The facts are not in dispute. The relevancy of the facts, however, are disputed in a number of instances. The parties entered into a detailed stipulation of some 433 pages and submitted the same to the court reserving their objections to the relevancy or materiality of certain portions thereof. From this voluminous stipulation and admissions in the pleadings the following relevant facts are material to this decision.

The Southwestern part of the United States suffered, beginning in 1951, the worst drought in its history which drought continued into 1957. As a result of this drought, the range dried up and many ranchers not only sent their steers to market but also were sending their breeding herds to market. This caused a glut on the market and the prices broke sharply. The United States, through its duly elected and appointed officials, and in cooperation with state authorities, recognized this situation, and in order to preserve the supply of meat, Congress authorized a program designed to assist established ranchers and farm-

ers located in disaster areas to maintain their basic livestock herd.

The lack of rainfall extending over the period of years from 1952 to 1956 became progressively more severe and devastating in its effect, and at the time when there was no feed on the range in the form of grass, the Robbins Ranch made application for emergency feed. The areas where the Robbins ranches were located had been proclaimed disaster areas by the President for many months. In order to retain more breeding animals on the ranch and rather than send more breeding animals to market, the Robbins Ranch made application for emergency feed.

The Robbins Ranch was a partnership whose sole business activity was ranching and farming. The partners were Edward C. Robbins and Richard W. Robbins. The partnership had over a period of years established a fine large breeding herd. The balance sheet of the Robbins Ranch showed a total value of over a million and a half dollars in 1951. This was reduced by 1956 to $868,073.56. The statement of income of the Robbins Ranch disclosed a net operating loss of over $32,000 in 1950 and up to $160,546.09 in 1956. The only year in which there was a net operating income was 1951 and the income was $154,720.10. These losses were overcome by virtue of the sale of replacement breeding animals and breeding animals sold because of drought conditions. The net income of the Robbins Ranch during the period of 1950 to 1956 was in excess of a million and a half dollars. To obtain this income the Robbins Ranch had sold in excess of six thousand head of their breeding herd for a price of over three and one-third million dollars.

The Robbins Ranch, during the fall of 1956, made application and obtained approval for emergency feed allotment in Comanche and Chase Counties, Kansas. The application and the certificate in Comanche County certified that they had over a thousand head of livestock in their basic breeding herd, that they had other livestock consisting of 313 steer calves, and that they had 50 tons of hay on hand. The application then provides:

"* * * *Applicant Certification:* I certify that the above information is correct and that my principal occupation is farming or ranching, and that I do not have a supply of feed on hand to maintain my basic herd of livestock, listed in Item 1, until December 31, 1956. In order to provide a supply of feed for this livestock, I will need ——— tons of hay or __333,300__ pounds of surplus grains designated by the Commodity Credit Corporation in addition to the feed I have on hand and that to be harvested during that period, and hereby make application for the purchase of that amount of feed under the Emergency Feed Program. Without the assistance applied for under the Emergency Feed Program, I will be unable to maintain my basic foundation herd and to continue the livestock operation which I have been conducting for __37__ years.

"I WILL NOT SELL OR OTHERWISE DISPOSE OF ANY OF THE FEED HEREIN APPLIED FOR EXCEPT BY FEEDING IT TO MY BASIC HERD, in Comanche County.
"Date: __October 24, 1956.__

"*Committee Action:* We, the undersigned committeemen, certify that the above-named applicant—
"(X) Is eligible for assistance under the Emergency Feed Program and hereby approve (His) application for the purchase of ——— tons of hay or __232,300__ pounds of Surplus Grains designated by the Commodity Credit Corporation.
"( ) Is NOT eligible for assistance under the Emergency Feed Program. Comments:
Date: __October 24, 1956.__ * * *"

The Chase County application showed they had 162 head of livestock in basic herd on hand. They had 127 yearling steers and 200 tons of hay. It further provides:

"*Applicant Certification:* I certify that the above information is correct and that my principal occupation is farming or ranching, and that I do not have a supply of feed on hand to maintain my basic herd of livestock, listed in Item 1, until Dec. 31, 1956. In order to provide a supply of feed for this livestock, in addition to the feed I have on hand and that to be harvested during the above period, I will need ——— tons of hay, 70,000 pounds of Surplus Grains designated by the Commodity Credit Corporation.

"I hereby make application for the purchase of this amount of feed under the Emergency Feed Program.

"Without the assistance applied for under the Emergency Feed Program I will be unable to maintain my basic foundation herd and continue the livestock operation which I have been conducting for 23 years.

"I WILL NOT SELL OR OTHERWISE DISPOSE OF ANY OF THE FEED HEREIN APPLIED FOR EXCEPT BY FEEDING IT TO MY BASIC HERD IN Chase County. "Date: October 12, 1956.

"*Committee Action:* We, the undersigned committeemen, certify that the above-named applicant—

"(X) Is eligible for assistance under the Emergency Feed Program and hereby approve (His) application for ——— tons of hay, 64.000 pounds of Surplus Grains designated by the Commodity Credit Corporation.

"( ) Is NOT eligible for assistance under the Emergency Feed Program. Comments:

"Date: October 12, 1956. * * *"

The Robbins Ranch presented the applications approved by the Farmers Home Administration County Committee to the office of the Agricultural Stabilization and Conservation (A.S.C.) Committee of the county in which the respective applications were filed. The A.S.C. County Committee issued the purchase order to the Robbins Ranch. These purchase orders were dated, numbered and signed by the authorized representative of the County Committee. The terms of issuance of the purchase order provided generally that the named farmer could use the purchase order to purchase only the designated amount of surplus feed grains from a "dealer" for use as livestock feed. The "dealers" to whom the purchase orders were transferred presented them to the A.S.C. County Committee shown on the purchase orders. The A.S.C. County Committees issued to the eligible dealer who executed the certification on the purchase order a "Dealer's Certificate", bearing a certain number. The Dealer Certificate was then presented to the Commodity Credit Corporation (C.C.C.).

The "Dealer's Certificates" issued by the A.S.C. committees totaled $4,273.35 and were redeemed by the C.C.C. at their face value in C.C.C.—owned surplus feed commodities delivered to the "Dealers". The Dealer's Certificates in question were issued by the A.S.C. County Committees in December of 1956.

The members of the respective county committees established by the Farmers Home Administration who passed upon and approved the Robbins Ranch applications each stated substantially that, in acting upon and approving the application of the Robbins Ranch, the board did not rely upon the wording of the application to any greater extent than upon any other application, but used its knowledge of local drought conditions and its effect on the Robbins Ranch and the breeding herd maintained by the Robbins brothers, and approved said application in the same manner and after applying the same thought and consideration given to each and every application filed. The committees stated no statements were made to the boards by the Robbins brothers or

their agents, either in the application or otherwise by which said board was deceived or defrauded.

There is no contention on the part of the United States that the board, consisting of the local county committees of the Farmers Home Administration, acted otherwise than in good faith, that they had been guilty of any misconduct, or that by the approval of the applications, they had defrauded the federal government.

The state administrative officer of the Farmers Home Administration by letter dated July 17, 1957, advised the Robbins that the Administration had determined that they were ineligible to participate in the feed grain program and demanded a return of some $4,273.35. The Robbins refused to pay and the action was commenced by the United States in this Court.

The United States, in its brief, states its contention thus:

"To reduce this case to its simplest terms, plaintiff (U. S.) contends that the defendants were financially able to purchase feed for their basic herd and that the following certification, 'Without the assistance applied for under the Emergency Feed Program I will be unable to maintain my basic foundation herd and continue the livestock operation which I have been conducting for ———— years,' which was a part of each application submitted for emergency feed, was false and fraudulent for the reason that the defendants were financially able to purchase the feed they obtained as a result of said application."

The Emergency Feed Program of the Federal Government now under consideration by this court has been before the District and Circuit Courts of the Eighth Circuit in the cases of United States v. Wiley's Cove Ranch, D.C., 181 F.Supp. 371; affirmed 295 F.2d 436 (C.A.8, 1961).

The history of the Emergency Feed Program and a detailed analysis of the basic statutory authority and the enabling administrative rules adopted and published by the Secretary of Agriculture to carry out this program have been carefully documented in these cases. We deem it unnecessary to repeat or document the history, statutory authority, or administrative rules in full. We would point out, however, that the basic statutory authority is found in 12 U.S.C.A. § 1148a–2(d), which says in part:

"The Secretary is authorized in connection with any major disaster determined by the President to warrant the assistance by the federal government * * * to furnish to established farmers, ranchers, or stockmen feed for livestock or seeds for planting for such period or periods of time and under such terms and conditions as the Secretary may determine to be required by the nature and effect of the disaster."

The Secretary of Agriculture delegated to the Farmers Home Administration the duty of administering the program (19 Federal Register 4674).

The Farmers Home Administration promulgated regulations prescribing the eligibility of an applicant and the procedure to be followed. Paragraphs 388.1 to 388.6 of Title 6, Code of Federal Regulations (19 F.R. 5199).

The regulations established a County Committee to determine the eligibility for those seeking aid under the program. The District Court in the Wiley's Cove Ranch case, supra, stated:

" * * * the County Committee was given wide discretion in determining eligibility and was specifically authorized to consider the following:

"(1) The application

"(2) Knowledge of the committeemen concerning the applicants' operations and finances

"(3) Local conditions and probable duration of the emergency feeding period

"(4) The general effect of the emergency conditions on applicant's ability to meet his future operating expenses

"(5) The probable effect of the emergency on applicant's income." [1]

The United States Court of Appeals for Eighth Circuit reviewed in the Wiley's Cove Ranch case, supra, the regulations pertinent to the agency action necessary to certify those persons eligible for relief under the Emergency Feed Program. There the Court of Appeals said:

"We construe the language of the regulations as giving to the Committee unqualified discretion and authority for the determination of eligibility to receive assistance under the Emergency Feed Program.

"In view of such authority, and considering the Committee's special competence, we hold with the District Court that the certification of appellee's eligibility to receive benefits under the Emergency Feed Program constituted 'agency action by law committed to agency discretion.'" (295 F.2d at page 443.)

In the Wiley's Cove Ranch case, the Court not only held that absent fraud there can be no judicial review or inquiry, but in addition, held that the action of the County Committee was a final determination and that there could be no administrative review from the report of the County Committee.

In July 1956 regulations pertaining to Part 475—1956 Emergency Feed Program were issued by the Commodity Credit Corporation. (21 F.R. Number 132.)

The general statement of these regulations discloses their purpose. It is there stated,

"The regulations contained in this part state the terms and conditions: (a) under which approved applicants in designated areas will be issued Farmer's Purchase Orders which may be tendered to dealers as part payment for designated surplus feed grains for use of livestock feed, (b) under which dealers who accept Farmer's Purchase Orders will be issued Dealer's Certificates, and (c) under which Dealer's Certificates may be presented to C.C.C. for the purchase of available designated C. C.C. owned surplus feed grains." (475.25.)

The regulations also define certain of the terms:

"Farmer" means a farmer, rancher or stockman, whose application for assistance under the 1956 Emergency Feed Program has been approved by a Farmer's Home Administration County Committee."

---

1. The FHA regulations governing eligibility of participants in the Emergency Feed Program and the determination of eligibility provide as follows:
"Sec. 388.4 *Eligibility*. Subject to the following conditions, any established farmer or stockman (partnership or corporation) whose principal occupation is farming or ranching and whose financial condition is such that he requires assistance under this program in order to maintain his foundation herd of livestock and continue his livestock operations, is eligible for assistance under the Emergency Feed Program. The fact that the purchase of hay or other feed at regular prices may not be profitable to the applicant is not sufficient to qualify him for assistance. * * *
"Sec. 388.6 *Committee Action.* (b) * * * In making this determination

(of eligibility) the committee will base its decision primarily upon the information supplied by the applicant, but will take into consideration other information, including knowledge of the Committeemen concerning the applicant's operations and finances, local conditions, and probable duration of the emergency feeding period, the general effect of the emergency conditions on the applicant's ability to meet his future operating expenses, and the probable effect of the emergency on the applicant's income. Each Committee will be expected to * * * take reasonable precautions to see that hay or other feed is not furnished under this program to farmers or stockmen who are otherwise able to maintain their foundation herds without such assistance * * *." (19 F.R. 5199.)

(475.27(d).) "The term 'Dealer' means any person * * * engaged in selling designated surplus feed grains or approved mixed feed." (475.27(e).)

"An 'Eligible Dealer' means a dealer who has entered into a feed dealer's agreement with C.C.C. and is entitled to present purchase orders to County A.S.C. Committees in exchange for Dealer's Certificates." (475.27(f).)

The regulations then go on to provide that:

"Farmers' Purchase Orders * * * will be issued only in areas which have been designated by the President under Public Law 875, 81st Congress, as areas of major disaster, and also by the Secretary of Agriculture under Public Law 38, 81st Congress, as amended by Public Law 115, 83rd Congress, and Section 301 of Public Law 480, 83rd Congress, as areas in which assistance of the nature provided for herein is needed." (475.28(a).)

The transfer by farmers of purchase orders,

" * * * may be used by the farmer to whom issued only for purchases made on or after the date of approval of the application * * * of designated surplus feed grains or approved mixed feed by his transfer of such purchase order to a dealer as part payment on the purchase price of such grains and feed. A dealer to whom a purchase order is transferred is required, in order to obtain a dealer's certificate based thereon, to accept such purchase order as part payment to the full extent of the value thereof as specified in Paragraph (d) of this section for each hundredweight of designated surplus feed grains and approved mixed feeds shown thereon, up to the maximum value of the purchase order." (475.-28(c).)

The regulations further provide:

"Subject to all of the provisions of this part, valid Dealer's Certificates, if presented to C.C.C. by the holder within 120 calendar days after the date of issuance, will be accepted at face value for the purchase of available designated C.C.C. —owned surplus feed grains." (475.30.)

The holdings of the Courts in the Wiley's Cove Ranch cases, in our opinion, are sound but they are premised as was heretofore pointed out on the absence of fraud on the part of those participating in the program.

The issues before the Court in this case, however, are whether or not the defendants made a claim against the United States, and if they made a claim was it false, fictitious, or fraudulent, within the meaning of 31 U.S.C.A. § 231, the False Claims Act.

The facts in this case disclose that the defendants made an application to the F.H.A. County Committee. Their applications were approved and the F.H.A. County Committee issued the defendants a purchase order. The defendants presented their purchase order to certain grain dealers in exchange for surplus feed available at a certain price from these dealers. The defendants at this point had obtained no feed from the federal government, the most that can be said was that they obtained feed from a grain dealer on the basis that the grain dealer could use the purchase order to obtain a Dealer's Certificate. The defendants ceased to become involved in the transaction from this point forward. Dealer's Certificates could only be obtained from the A.S.C. County Committee which had originally issued the Farmer's Purchase Order which had been presented to the grain dealer. The grain dealer then presented his Dealer's Certificate if it was valid and met the requirements of the regulations to the C.C.C. to purchase C.C.C. surplus feed grains.

■ The *Commodity Credit Corporation* has been determined to be an administrative device established by Congress for the purpose of carrying out federal farm programs with public funds. It has also been determined that false claims made against Commodity Credit Corporation are covered by the False Claims Act. Rainwater v. United States, 356 U.S. 590, 78 S.Ct. 946, 2 L.Ed.2d 996 (1958).

The False Claims Act, 31 U.S.C.A. § 231, provides in part as follows:

"Any person * * * who shall make or cause to be made, or present or cause to be presented * * * any claim upon or against * * * the United States * * * knowing such claim to be false, fictitious, or fraudulent, or who, for the purpose of obtaining * * * the payment or approval of such claim, makes * * * any false bill, receipt, voucher, roll, account, claim, certificate, affidavit, or deposition, knowing the same to contain any fraudulent or fictitious statement * * * shall forfeit and pay to the United States the sum of $2,000, and, in addition, double the amount of damages which the United States may have sustained by reason of the doing or committing such act, together with the costs of suit; and such forfeiture and damages shall be sued for in the same suit."

The interpretation of the term "claim" as used in the False Claims Act, has been set forth by the Supreme Court of the United States in United States v. McNinch, 356 U.S. 595, 78 S.Ct. 950, 2 L. Ed.2d 1001, stating:

" * * * that in determining the meaning of the words 'claims against the Government' we are actually construing the provisions of a criminal statute. Such provisions must be carefully restricted, not only to their literal terms but to the evident purpose of Congress in using those terms, particularly where they are broad and susceptible to numerous definitions. See United States ex rel. Marcus v. Hess, 317 U.S. 537, 542 [63 S.Ct. 379, 87 L.Ed. 443]; United States v. Wiltberger, 5 Wheat. 76, 95–96 [5 L.Ed. 37]."

The Supreme Court, in the case of the United States v. McNinch, 356 U.S. 595, 78 S.Ct. 950, 2 L.Ed.2d 1001, pointed out in the Footnote 10:

"While the word 'claim' may sometimes be used in the broad judicial sense of a 'demand of some matter as a right made by one person upon another, to do or to forebear to do some act or thing as a matter of duty', * * * it is clear, in the light of the entire context, that in the present statute, the provision relating to the payment or approval of a 'claim upon or against' the Government relates solely to the payment or approval of a claim for money or property to which a right is asserted against the Government, based upon the Government's own liability to the claimant."

In the McNinch case the Supreme Court had before it the question of whether or not a lending institution application for credit insurance under the Federal Housing Administration Program was a claim as that term was used in the False Claims Act. The Supreme Court said,

"In normal usage or understanding of an application for credit insurance would hardly be thought of as a 'claim against the government.' As the Court of Appeals for the Third Circuit said in this same context, 'the conception of a claim against the government normally connotes a demand for money or for some transfer of public property.' United States v. Tieger [3 Cir.] 234 F.2d, 589, 591. In agreeing to insure a home improvement loan the FH A disburses no funds nor does it otherwise suffer immediate financial

detriment. It simply contracts, for a premium, to reimburse the lending institution in the event of future default, if any."

The Supreme Court did not reach the question we have here because there had been no default and the lending institution in McNinch had not made demand for reimbursement. The analogy, of McNinch to the present case is the effort of the United States to require a legal conclusion that the farmer's application to the F.H.A. County Committee for surplus feed is a "claim" under the False Claims Act.

In holding the application for credit insurance was not such a "claim". The Supreme Court also said in McNinch:

"We acknowledge the force in the Government's argument that literally such an application could be regarded as a claim, in the sense that the applicant asserts a right or privilege to draw upon the Government's credit. But it must be kept in mind, as we explained in Rainwater, that in determining the meaning of the words 'claim against the Government' we are actually construing the provisions of a criminal statute. Such provisions must be carefully restricted, not only to their literal terms but to the evident purpose of Congress in using those terms, particularly where they are broad and susceptible to numerous definitions. See United States ex rel. Marcus v. Hess, 317 U.S. 537, 542 [63 S.Ct. 379, 87 L.Ed. 443]; United States v. Wiltberger, 5 Wheat. 76, 95–96 [5 L.Ed. 37]."

■ The reasoning in the McNinch case does not lend itself to a determination that the defendants' applications in the instant case could be considered claims under the False Claims Act. Its money or property was not paid out by the United States on the defendants' application, but upon the "Dealer's Certificates" to the Eligible Dealers. See also the case of United States v. Borth, 266 F.2d 521 (C.A.10, 1959).

There is still another reason why the defendants' application cannot be considered a claim under the False Claims Act. One of the essential elements toward a recovery based on actionable fraud, is that not only is the representation false, but that the person to whom the representation or application was made must rely on such application. The Government in the present case did not rely upon the application of the defendants, but relied upon the independent action of the F.H.A. County Committees. In the case of United States v. Goldberg, D.C., 158 F.Supp. 544, it was stated that where the United States does not rely alone upon the representation of one making a claim, but determines the facts by an independent investigation, there can be no action under the False Claims Act.

If, arguendo, the applications signed by the defendants or their agents were to be considered "claims", the United States has, in our opinion, failed to prove that such applications were, in fact, false, fraudulent or a misrepresentation which amounted to fraud. The Supreme Court of the United States has defined fraud to mean, "conscious wrongdoing, and intention to cheat or to be dishonest." United States v. Wunderlich, 342 U.S. 98, 72 S.Ct. 154, 96 L.Ed. 113.

■ The United States must, in our opinion, in order to establish that the defendants made a false claim against it, prove that there was a false representation of a material fact made with knowledge of its falsity which false representation must be believed and acted upon by the United States to its damage. Cahill v. Curtiss-Wright Corporation, D.C., 57 F.Supp. 614; United States v. Farina, D.C., 153 F.Supp. 819; United States v. Park Motors, D.C., 107 F.Supp. 168; Mandel v. Cooper Corporation, D.C., 42 F.Supp. 317.

■■ The Government's proof should be by clear, explicit and unequivocal evi-

dence, since fraud is never presumed. Proctor v. Sagamore Big Game Club, 3 Cir., 265 F.2d 196 at 202 and Hablas v. Armour & Company, 8 Cir., 270 F.2d 71 at 77.

The regulations governing the Emergency Feed Program for the disaster areas established an F.H.A. County Committee to certify to the eligibility of applicants. The regulations did not provide for agency review or judicial review of the actions of the F.H.A. County Committee. The applications and certificates of the defendants to obtain emergency feed stated only that without the amount of feed set forth in the applications, they would be unable to maintain the basic foundation herd and continue the livestock operation in the county named which they had been conducting for many years. The F.H.A. County Committees were well acquainted with the defendants, their livestock operations, the size of their herds, the fact that they had had to reduce the size of their herd, their financial condition, and the condition of the disaster area in which they were carrying on their livestock operations. These committees had been advised that the Director of Agriculture Credit Services, United States Department of Agriculture, had stated with respect to the regulations for their guidance that:

"The published regulations which guide these committees in the review of applications provide that applicants will not be certified when they are financially able to obtain the necessary feed for their basic herds without difficulty and also continue their normal farming or livestock operations. In the review of the individual applications the Committees give consideration to the applicant's total operations, the extent of the feed losses due to drought or other reasons, the effect of these losses on the applicant's income and

his ability to carry on his normal farming or livestock operations and also maintain his basic herds. It is not expected that applicants will exhaust their total resources, including credit, before they might be certified as eligible for assistance through the emergency feed program. However, the fact that the purchase of feed at regular prices may not be profitable to the applicant is not sufficient to qualify him for assistance." [2]

The President determined that these counties were disaster areas. Webster's New International Dictionary Second Edition defines disaster as "an unforeseen and ruinous misfortune or mischance (as a shipwreck, a fatal railroad accident, the failure of a great enterprise) which happens, often suddenly, either through culpable lack of foresight or through adverse external agency." The defendants had money. Money, issued by a recognized authority, is a medium of exchange. It generally is not useful as a medium of exchange for something which does not exist or which is not available at a particular time. Thus, food and water delivered at some future time may not prevent death caused by present starvation. Individual financial resources rarely prevent the disasters resulting from war, famine, disease and death.

The F.H.A. County Committees, acting to mitigate the effect of a disaster, authorized the A.S.C. representative to issue the purchase orders by which the defendants could obtain the emergency feed from feed dealers' supply of surplus feed controlled by the United States for imperiled herds of cattle. The record in this case does not disclose fraud nor such a gross mistake on the part of the F.H.A. County Committee or the defendants which would necessarily imply their bad faith or failure to exercise an honest

2. See Review Committee, VII, Courts v. Willey, 8 Cir., 275 F.2d 264, 272, where it was said:

"It is well settled, of course, that administration construction of an Act is entitled to great weight. Federal Trade Commission v. Mandel Bros., Inc., 359 U.S. 385, 391, 79 S.Ct. 818, 823, 3 L.Ed.2d 893."

judgment. The burden was on the United States to prove fraud and to overcome the committee's presumed valid findings. This, in our opinion, it has failed to do.

Judgment will be granted for the defendants.